**UNITED STATES STEEL CORP., Republic Steel Corp., et al., Plaintiffs,**

v.

**UNITED STATES, et al., Defendants,**

**and**

**Companhia Siderurgica Paulista (Cosipa) and Usinas Siderurgicas De Minas Gerais (Usiminas), Defendants-Intervenors.**

**Court No. 82–10–01361.**

United States Court of International Trade.

June 2, 1983.

Law Dept. of U.S. Steel Corp. for plaintiff U.S. Steel Corp.

Cravath, Swaine & Moore, New York City (Joseph R. Sahid, New York City, of counsel), for plaintiffs Republic Steel Corp., et al.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C. (David M. Cohen, Branch Director, Commercial Litigation Branch, Washington, D.C., Velta A. Melnbrencis and Francis J. Sailer, Attys., Commercial Litigation Branch), Washington, D.C., for defendants.

WATSON, Judge:

On a motion for review under Rule 56.1, this opinion deals with one facet of the judicial review of a recently concluded countervailing duty investigation involving steel imports from South Africa and Brazil. This facet involves the final determination made with respect to an alleged railroad rate subsidy granted by South Africa. For exports from South Africa, the assessment of countervailing duties depends solely on whether a subsidy has been provided in the sense of the "bounty or grant" identified in 19 U.S.C. § 1303.[1]

The International Trade Administration of the Department of Commerce (ITA) made a preliminary determination on June 10, 1982, that the South African Transport Services (SATS), a government-owned corporation, set a railroad rate for exported steel which resulted in a subsidy because it was lower than the rate for domestic steel shipped under the same conditions. 47 Fed. Reg. 26,340, 26,341 (1982).

In its final determination, on August 23, 1982, the ITA found that SATS had, after the preliminary determination, made the lower rate available to domestic steel shipments. The administrative record indicates that this was done in July, (AR 3863),[2] by means of telex messages to various port managers from the SATS general manager, and was later made retroactive to April 1,

1982, (AR 4265). The ITA then found that the rail rate was not a subsidy for shipments exported after April 1, 1982.

## I

Plaintiffs, who were petitioners for the assessment of countervailing duties, first complain that this sequence of events required the use of the procedures of section 704 of the Trade Agreements Act of 1979 (19 U.S.C. § 1671c) and called for the suspension of the investigation and the emplacement of certain safeguards. The government argues that the plaintiffs waived their objections to the reaching of a final determination by not making a timely objection during the administrative proceedings.

■ The Court agrees with plaintiffs that these are not appropriate circumstances for applying the rule that courts will not hear procedural objections which could have been raised and corrected on the administrative level. The Court's examination of the record persuades it that plaintiffs did not have sufficient knowledge during the course of the investigation to place on them a duty to demand the use of section 704 procedures at that time. *Doyle v. United States,* 599 F.2d 984, 1001 (Ct.Cl.1979), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 837 (1980).

■ As will be shortly explained, the obligation to follow the procedures of section 704, possibly leading to suspension of the investigation, first arises at the time when the ITA finds that the practice alleged to be, or preliminarily found to be, a subsidy, will either be ended by a proposed agreement or has already been ended during the investigation. That finding is not accessible to petitioners until it is reached and announced by the ITA. Only then can an obligation be fairly placed on petitioners to

---

1. South Africa is not a "country under the Agreement" within the meaning of Section 701(b) of the Trade Agreements Act (19 U.S.C. § 1671(b)). Therefore, the imposition of countervailing duties on its exports does not require an injury determination by the International Trade Commission.

2. References to the administrative record are indicated by the prefix AR and the page number.

demand the use of the suspension procedures. If, as here, the finding mistakenly leads to a final determination, rather than being used as a starting point for the procedures of section 704, the final determination is the first event to which a procedural objection can be voiced and this judicial review is the first meaningful occasion for that objection to be expressed.

## II

We now move to the substantive dispute about the nature and use of Section 704. Plaintiffs claim that representations made by officials of a foreign government that a practice, (earlier alleged or found to be a subsidy) has been eliminated, represents the agreement to eliminate the subsidy referred to in section 704(b) (19 U.S.C. § 1671c(b)) and requires the ITA to follow the procedures of that section.

The government's response has two prongs. First, it argues that section 704 comes into play only after negotiations have taken place and the ITA is presented with a proposed agreement to end a subsidy. Second, it argues that even in that event, the ITA has complete discretion to choose between suspending the investigation or continuing it to a final determination.

Both sides seek support for their views in the language of section 704 and in the legislative history. The government reads the law as creating a narrow and completely discretionary alternative to the continuation of the investigation. It reads the history as speaking of suspension with a cautionary tone bordering on disfavor. The plaintiffs read the law as mandating suspension for the protection of domestic petitioners in cases where an alleged subsidy is ended during the investigation.

The government takes the position that it has actually helped plaintiffs more by its final determination than by suspending the investigation. It points out that, even though it found that the subsidy was no longer in effect after April 1, 1982, it continued the suspension of liquidation of entries (which had begun after the preliminary determination). It did so by characterizing the result as an affirmative determination with a zero amount of subsidy after April 1, 1982. Thus, it assertedly left all entries subject to the retroactive assessment of countervailing duties if a later administrative review under section 751 (19 U.S.C. § 1675) should reveal the resumption of the subsidy.

■ The Court now proceeds with its analysis of the law, dealing at each appropriate point with the arguments of the parties. The analysis leads to the conclusion that the events of this investigation required the ITA to use the procedures of section 704, if it found that the subsidy had ended during the investigation.

Section 704 appears prominently between the provision for preliminary determinations in section 703 (19 U.S.C. § 1671b) and the provision for final determinations in section 705 (19 U.S.C. § 1671d).

In it, we see an initial grant of authority to the ITA to suspend the investigation, in subsection (b) (19 U.S.C. § 1671c(b))[3] when the foreign interests[4] agree to eliminate the subsidy. The language "may suspend the investigation" is quickly seen to be, not the unlimited power to continue investigations, but simply the power to reject an

---

**3.** (b) *Agreements to eliminate or offset completely a subsidy or to cease exports of subsidized merchandise.* The administering authority may suspend an investigation if the government of the country in which the subsidy practice is alleged to occur agrees, or exporters who account for substantially all of the imports of the merchandise which is the subject of the investigation agree—
(1) to eliminate the subsidy completely or to offset completely the amount of the net subsidy, with respect to that merchandise exported directly or indirectly to the United States, within 6 months after the date on which the investigation is suspended, or
(2) to cease exports of that merchandise to the United States within 6 months after the date on which the investigation is suspended.

**4.** For ease of discussion the term "foreign interests" is used to describe the government of the country in which the subsidy practice is alleged to occur and the exporters who account for substantially all of the imports under investigation.

agreement to eliminate a subsidy which does not meet the requirements that the resulting suspension of investigation leave the petitioners in a secure position. Thus, the initial grant of authority to suspend must be read in conjunction with subsection (d), (19 U.S.C. § 1671c(d)) [5] which forbids the acceptance by the ITA of an agreement by the foreign interests unless the resulting suspension of the investigation is "in the public interest" and the agreement can be effectively monitored. This already implies strongly that the elimination of a subsidy will normally result in suspension of the investigation. It is as if Congress had said that investigations *shall* be suspended, *provided* that certain conditions are met, but chose to express its desire in a more circuitous way. When we add to this relation between subsections (b) and (d) the elaborate notification, consultation, and comment provisions of subsection (e),[6] the painstaking provisions of subsection (f)[7] regarding the complex effects of suspension, the strong provisions in subsection (i)[8] for quick resumption of the investigation and

5. (d) *Additional rules and conditions.*
(1) *Public interest; monitoring.* The administering authority shall not accept an agreement under subsection (b) or (c) unless—
(A) it is satisfied that suspension of the investigation is in the public interest, and
(B) effective monitoring of the agreement by the United States is practicable.

6. (e) *Suspension of investigation procedure.* Before an investigation may be suspended under subsection (b) or (c) the administering authority shall—
(1) notify the petitioner of, and consult with the petitioner concerning, its intention to suspend the investigation, and notify other parties to the investigation and the Commission not less than 30 days before the date on which it suspends the investigation,
(2) provide a copy of the proposed agreement to the petitioner at the time of the notification, together with an explanation of how the agreement will be carried out and enforced (including any action required of foreign governments), and of how the agreement will meet the requirements of subsections (b) and (d) or (c) and (d), and
(3) permit all parties to the investigation to submit comments and information for the record before the date on which notice of suspension of the investigation is published under subsection (f)(1)(A).

7. (f) *Effects of suspension of investigation.*
(1) *In general.* If the administering authority determines to suspend an investigation upon acceptance of an agreement described in subsection (b) or (c), then—
(A) it shall suspend the investigation, publish notice of suspension of the investigation, and issue an affirmative preliminary determination under section `703(b) [19 USC § 1671b(b)] with respect to the merchandise which is the subject of the investigation, unless it has previously issued such a determination in the same investigation,
(B) the Commission shall suspend any investigation it is conducting with respect to that merchandise, and

(C) the suspension of investigation shall take effect on the day on which such notice is published.
(2) *Liquidation of entries.*
(A) *Cessation of exports; complete elimination of net subsidy.*—If the agreement accepted by the administering authority is an agreement described in subsection (b), then—
(i) notwithstanding the affirmative preliminary determination required under paragraph (1)(A), the liquidation of entries of merchandise which is the subject of the investigation, shall not be suspended under section 703(d)(1) [19 USC § 1671b(d)(1)],
(ii) if the liquidation of entries of such merchandise was suspended pursuant to a previous affirmative preliminary determination in the same case with respect to such merchandise, that suspension of liquidation shall terminate, and
(iii) the administering authority shall refund any cash deposit and release any bond or other security deposited under section 703(d)(1) [19 USC § 1671b(d)(1)].

8. (i) *Violation of agreement.*
(1) *In general.* If the administering authority determines that an agreement accepted under subsection (b) or (c) is being, or has been, violated, or no longer meets the requirements of such subsection (other than the requirement, under subsection (c)(1), of elimination of injury) and subsection (d), then, on the date of publication of its determination, it shall—
(A) suspend liquidation under section 703(d)(1) [19 USC § 1671b(d)(1)] of unliquidated entries of the merchandise made on or after the later of—
(i) the date which is 90 days before the date of publication of the notice of suspension of liquidation, or
(ii) the date on which the merchandise, the sale or export to the United States of which was in violation of the agreement, or under an agreement which no longer meets the requirements of subsections (b) and (d) or (c)

the assessment of penalties in certain cases, the exercise of pure discretion by the ITA in this area is seen to be unreasonable on its face.[9]

It is impossible to believe that Congress provided this prominent and exhaustively detailed provision for use as a matter of unfettered discretion. The very emphasis placed on careful limitations on the authority to suspend shows that there was an expectation that the authority *had* to be used to deal with the elimination of alleged subsidies. The major concern of Congress was that it not be used when those eliminations somehow still jeopardized the public interest or the interests of domestic petitioners. By stressing those factors which justify denying suspension and by showing a clear concern for maintaining strong safeguards even after suspension, Congress revealed an expectation that suspension would be the normal and proper response to the elimination of a practice alleged to be a subsidy.

In approaching the interpretation of this provision, it can be assumed that Congress wrote it with the general expectation that most eliminations of subsidies would come about by means of a conventional process of negotiation and agreement. However, the Court finds it unreasonable to read this provision as operating only in response to a *proposal* to eliminate a subsidy in the future and not in response to the purported actual elimination of a subsidy in the course of the investigation. What this would mean, in the Court's view, is that the very situation which most directly accomplishes the legislative purposes, results in an avoidance of the careful and comprehensive procedures set up by Congress, both to organize the suspension of investigations and to leave petitioners in a secure position when investigations are suspended.

In the enactment of this provision the Court sees evidence of a Congressional intention to require that investigations be suspended, rather than continued, whenever the end of a subsidy is accomplished during the investigation. This intention is visible in the act itself, and in the legislative history. This provision is intended for use in those instances in which the focus of attention shifts from determining whether a certain practice is a subsidy or from measuring it, and moves to determining whether the practice is coming to an end.

An important point to be made is that the provision under discussion was enacted to make suspension of investigations *more* available than had previously been the case. Formerly, under section 303 of the Tariff

---

and (d), was first entered, or withdrawn from warehouse, for consumption,

(B) if the investigation was not completed, resume the investigation as if its affirmative preliminary determination under section 703(b) [19 USC § 1671b(b)] were made on the date of its determination under this paragraph,

(C) if the investigation was completed under subsection (g), issue a countervailing duty order under section 706(a) [19 USC § 1671e(a)] effective with respect to entries of merchandise the liquidation of which was suspended, and

(D) notify the petitioner, interested parties who are or were parties to the investigation, and the Commission of its action under this paragraph.

(2) *Intentional violation to be punished by civil penalty.*—Any person who intentionally violates an agreement accepted by the administering authority under subsection (b) or (c) shall be subject to a civil penalty assessed in the same amount, in the same manner, and under the same procedure, as the penalty imposed for a fraudulent violation of section ·592(a) of this Act. [19 USC § 1592(a)].

9. This brief overview of section 704 does not include other portions which are not directly relevant here, other than perhaps to show the exhaustive attention that Congress gave to suspension. Reference is made to subsection (a) (19 U.S.C. § 1671c(a)) providing for termination of the investigation when the petition is withdrawn; subsection (c) (19 U.S.C. § 1671c(c)) which gives a highly detailed alternative method of suspension by agreement to eliminate the *injurious effect* of a subsidy; the latter portion of subsection (f) (19 U.S.C. § 1671c(f)(3)) in conjunction with subsection (g) which operates to continue, in a provisional way, an investigation which has been suspended; subsection (h) (19 U.S.C. § 1671c(h)) which provides administrative review of the suspension, and subsection (j) (19 U.S.C. § 1671c(j)) which maintains the relevance of merchandise entered while a suspension is in effect, if the investigation is later resumed.

Act of 1930 (19 U.S.C. § 1303) the Secretary of the Treasury could either terminate the investigation when a petition was withdrawn, or waive the imposition of countervailing duties after the investigation was concluded. The suspension of ongoing investigations was not allowed.

This fundamental point leads one to conclude that, far from looking with disfavor on the suspension of investigations, Congress saw it as a useful and necessary practice. A relatively full excerpt from the Report of the Senate Committee on Finance serves to convey a sense of the legislative intentions in this provision.

> Section 704 would also establish criteria and procedures for suspending an investigation upon acceptance of an agreement by a foreign government or exporters to take remedial action. The suspension provisions would implement Article 4(5) and (6) of the Agreement for the United States.
>
> The suspension provision is intended to permit rapid and pragmatic resolutions of countervailing duty cases. However, suspension is an unusual action which should not become the normal means of disposing of cases. The committee intends that investigations be suspended only when that action serves the interests of the public and the domestic industry affected. For this reason, the authority to suspend investigations is narrowly circumscribed. In particular, agreements which provide for any action less than elimination of the subsidy, complete offset of the net subsidy amount, or cessation of exports can be accepted only in extraordinary circumstances. That is to say, very rarely. Furthermore, the requirement that the petitioners be consulted will not be met by pro forma communications. Complete disclosure and discussion is required.
>
> The committee intends that no agreement be accepted unless it can be effectively monitored by the United States. This will require establishment of procedures under which entries of merchandise covered by an agreement can be reviewed by the authority and by interested parties. Adequate staff and resources must be allocated for monitoring to insure that relief under the agreement occurs.

S.Rep. No. 96–249, 96th Cong., 1st Sess. 54 (1979), U.S.Code Cong. & Admin.News 1979, pp. 381, 440.

The basic intention expressed above is to permit the "rapid and pragmatic resolution of countervailing duty cases" in response to agreements by the foreign interests "to take remedial action." What could be more rapid, pragmatic and remedial than the immediate cessation of the practice alleged to be a subsidy? The reservations or uneasiness expressed by the Committee are directed to suspensions of investigations which may not serve the interests of the public and the domestic industry. Consequently, it would be a distortion of the legislative intention to administer the act in a manner which is inconsistent with those interests. The tight controls written into the law and the discretion given to the ITA were designed, not to diminish the use of section 704, but primarily to safeguard the interests of the domestic petitioners in those instances when events required the use of the procedures of section 704. The law is preoccupied with controls on the *acceptance* of an agreement because Congress was concerned with unjustified suspension harming the domestic petitioners. This does not mean that *rejection* of suspension is uncontrolled or can be unreasoned.

In order for section 704 to have its intended usefulness, it must be followed by the ITA whenever the proper conditions for suspension are present and those conditions include both actual elimination of subsidies and offers to eliminate them *in futuro.*

Otherwise, the provision for suspension and the safeguards it provides for the petitioners will be thwarted. Why should a foreign interest offer an agreement to end a subsidy, thus inviting comment, monitoring, quick resumption of the investigation and penalties for intentional violation, when it can present the end of the subsidy as a *fait accompli* during the investigation, obtain a negative determination and achieve an entirely unimpeded resumption

of its exportations? All it need endure to achieve this result is a short additional period (up to the time of the final determination) during which estimated duties will have to be paid. If it should again subsidize in the same manner, an entirely new investigation would have to be started.

Unless suspension of the investigation takes place for both actual eliminations of subsidies and promises to end them, the following unacceptable situations arise: the wasteful and unnecessary continuation of investigations, a negative determination (if the subsidy is indeed eliminated) without any of the protections intended by Congress, i.e., no consultation or comment, no articulated decision by the ITA, no monitoring, no speedy resumption and no penalties for intentional violation.

If anything, the elimination of a subsidy by *fait accompli,* comes within the provision of section 704 by pure *a fortiori* reasoning. If the procedures of section 704 must be followed in response to a proposed agreement (the more extreme case) they must certainly be followed in response to a representation of actual elimination (the lesser case).

The unusual step taken here by the ITA in maintaining the suspension of liquidation despite the finding that the subsidy had ended is not an acceptable alternative to the safeguards of section 704. It is a makeshift arrangement of questionable legitimacy when one considers the requirement that suspension of liquidation be ended when there is a negative final determination. 19 U.S.C. § 1671d(c).[10] The characterization of this determination as affirmative, but of a zero amount after April 1, 1982, is inaccurate. It is more correctly described as a

determination that a subsidy was not being provided after April 1, 1982, i.e., a negative determination. *Republic Steel Corp. v. United States,* 4 C.I.T. ——, (Slip Op. 82–55, July 15, 1982).

Moreover, the reliance on a future annual review proceeding as a safeguard is misplaced because in the case in which a subsidy is eliminated *in toto,* and no period of subsidy is left on which to improvise a continuation of suspension of liquidation, the result must be a negative determination, for which there will be no annual review.

If, at any time before the end of the investigation, the ITA finds that the foreign interests have (since the commencement of the investigation) acted to end or offered to end the practice alleged or preliminarily found to be a subsidy, then the ITA *must* suspend the investigation of that practice unless it can give a good reason for continuing the investigation. It has the discretion to continue the investigation if it can articulate reasons which are sanctioned by section 704.

With these considerations in mind, it is plain that the basic language of section 704(b) (19 U.S.C. § 1671c(b)) cannot be given a simplistic reading when it states that the ITA "may suspend an investigation if the government of the country in which the subsidy practice is alleged to occur agrees ... to eliminate the subsidy completely." The interaction of the other subsections and the force of the legislative intention, as well as the practical considerations earlier discussed, indicate that this is not a grant of unfettered discretion to suspend and is not restricted to agreements operating *in futuro.*[11]

10.         * * * * *

(2) *Issuance of order; effect of negative determination.* If the determinations of the administering authority and the Commission under subsections (a)(1) and (b)(1) are affirmative, then the administering authority shall issue a countervailing duty order under section 706(a) [19 USC § 1671e(a)]. If either of such determinations is negative, the investigation shall be terminated upon the publication of notice of that negative deter-

mination and the administering authority shall—
(A) terminate the suspension of liquidation under section 703(d)(1) [19 USC § 1671(d)(1)], and
(B) release any bond or other security and refund any cash deposit required under section 703(d)(2) [19 USC § 1671b(d)(2)].

11. The government also argues that the ITA has the same sort of alternative authority here that the President was found to have in negoti-

If indeed we have here a situation in which Congress did not literally address the circumstance of a foreign interest ending or purporting to end the subsidy during the investigation, then the Court has an obligation to extend the unmistakable legislative intention and to prevent the development of absurdities which tend to undermine the operation of the law and violate its spirit. *Asahi Chemical Industry Company, Ltd. v. United States*, 4 CIT ——, 548 F.Supp. 1261 (1982). As was stated in that opinion at page 1267:

> If a reading of a statute leads to a result which is "contrary to the Congressional intent and leads to absurd conclusions," it is to be rejected. *United States v. Bryan*, 339 U.S. 323, 338 [70 S.Ct. 724, 734, 94 L.Ed. 884] (1950). "No rule of construction necessitates ... acceptance of an interpretation resulting in patently absurd consequences." *United States v. Brown*, 333 U.S. 18, 27 [68 S.Ct. 376, 381, 92 L.Ed. 442] (1948).

The Court's views on the use of section 704 lead to the conclusion that the ITA should have followed those procedures if it thought that the rail rate subsidy had ended. The minor difficulty of putting the perceived *fait accompli* in a form which is also an undertaking as to future conduct and which can be the subject of the consultation and comment required, is easily surmounted. The attempt at elimination of the subsidy must already imply a willingness to maintain the elimination. Otherwise it is obviously an illusory expedient. Therefore, if the foreign interests are invited or required to present the represented elimination of a subsidy in the form of an undertaking as to future conduct, they are not being forced to agree to anything which is not already implicit in their conduct. This would merely be a requirement that they present their action in the form required by the law.

During 1982 there were other countervailing duty investigations which involved

ating duty increases in *Aimcee Wholesale Corp. etc. v. United States*, 60 CCPA 1, 468 F.2d 202 (1972). However, the statutory provisions and all the other circumstances involved

the SATS rail rates, and the parties here have both sought support from the manner in which those investigations were conducted and concluded. The government points to the final determination in an investigation of deformed steel bars for concrete reinforcement ("rebars") from South Africa in which it was determined that lower rail rates for export rebars were ended effective April 1, 1982, and did not represent a subsidy after that date. 47 Fed.Reg. 47,902 (1982). The Court is not persuaded that this represents anything other than the same misunderstanding of statutory procedures found in this case.

Plaintiffs point to investigations of prestressed concrete steel wire strand and steel wire rope from South Africa which were suspended under section 704 (47 Fed.Reg. 22,137–39 and 47 Fed.Reg. 54,130–32 (1982)) as examples of the correct procedure. However, since those cases involved conventional negotiated agreements they do not illustrate the conduct required when agreement by unilateral action is involved.

In brief, the contemporaneous investigations do not provide precedent or guidance for the situation confronting us here. That guidance is derived from the statute itself, the legislative history and the compelling necessity of effectuating the legislative intentions.

### III

■ The Court must also discuss the ITA's finding that the rail subsidy had ended. Assuming that it had led to the suspension of the investigation, that suspension would have been judicially reviewable under 19 U.S.C. § 1516a(a)(2)(A). In the interest of guiding the ITA in the renewed investigation which this opinion requires, the Court must express its disagreement with the conclusion that the rail subsidy had been eliminated.

in *Aimcee* were so different from those involved here that a comparison between the two cases is simply out of the question.

The finding that the lower rate for export steel had been extended to all steel shipments made under the same conditions was insufficient to support a conclusion that the subsidy had been eliminated. That conclusion can be reached only if it is found that the lower rate is available to *all* products shipped under the same conditions. The general availability of such a rate, coupled with a finding that it is a profitable rate, justified by demonstrable economies of transportation, may then serve to support a finding that the subsidy does not exist. *Carlisle Rubber and Tire Co. v. United States,* 5 CIT ——, 564 F.Supp. 834 (1983).

The countervailing duty law operates in cases where a special advantage or preferential treatment is given to a class of persons. Availability of special treatment to an entire industry or region is still the grant of an advantage or preference under the law. *A.S.G. Industries, Inc. v. United States,* 67 CCPA 11, C.A.D. 1237, 610 F.2d 770 (1979); *ASG Industries, Inc. v. United States,* 67 CCPA 31, C.A.D. 1238, 610 F.2d 785 (1979); *ASG Industries, Inc. v. United States,* 82 Cust.Ct. 101, C.D. 4794, 467 F.Supp. 1200 (1979); *Michelin Tire Corporation v. United States,* 2 CIT 143 (1981); *Macalloy Corp. v. United States,* 1 CIT 199 (1981).

If the lower rate was a preference when it was available to export steel only, it remains a preference when it has been made available to all steel. The distinction between steel and other products is suspect, particularly when the investigation showed that the SATS rate schedule "generally provides railroad rates for shipments destined for export that are lower than domestic rates." 47 Fed.Reg. 39,380.

In the administrative proceeding, much attention was paid to the subject of cost justification of the lower rate under scrutiny, i.e., that the rate was justified by the lower costs of the steel shipments involved. However, the concept of cost justification is subordinate to the rule of general availability and, by itself, within an industry, is inadequate to show the absence of a subsidy. General availability means that what is available is accessible to all who are similarly situated. For a railroad rate this means available for the shipment of any products which offer similar economies of transportation. Cost justification of one rate for the product of an industry as opposed to another rate within that same industry is insufficient because it leaves unanswered the question of whether the rate sought to be justified should be more generally available. This means that for cost justification to work as a justification of a lower rate it must be shown to operate without making industry distinctions. In that frame of reference it is simply a method of confirming the *bona fides* of a rate which is first justified by being generally available.

The government points to the definition of subsidy in the Trade Agreements Act of 1979 (19 U.S.C. § 1677(5)) [12] as giving the term the same meaning as the subsidies described in Annex A to the Code on Subsidies and Countervailing Duties.[13] It then

---

**12.** (5) *Subsidy.* The term "subsidy" has the same meaning as the term "bounty or grant" as that term is used in section 303 of this Act [19 USC § 1303], and includes, but is not limited to, the following:

(A) Any export subsidy described in Annex A to the Agreement (relating to illustrative list of export subsidies).

(B) The following domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether publicly or privately owned, and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise:

(i) The provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations.

(ii) The provision of goods or services at preferential rates.

(iii) The grant of funds or forgiveness of debt to cover operating losses sustained by a specific industry.

(iv) The assumption of any costs or expenses of manufacture, production, or distribution.

**13.**                    ANNEX

*Illustrative List of Export Subsidies*

    *    *    *    *    *    *

(c) Internal transport and freight charges on export shipments, provided or mandated by

argues that Annex A lists among export subsidies only those internal transport charges on export shipments which are provided on terms more favorable than for domestic industry. This argument cannot be accepted. First, the definition of subsidy is open-ended. The statute expressly states that the term "includes but is not limited to" the examples which follow. Second, although the Code concentrates on export subsidies, it does recognize subsidies which do not have an export focus. Third, on its own terms the Annex illustration does not indicate that the favorable nature of the transport charges is displayed only by comparison within the same industry. It is more appropriate to harmonize this example with our law by finding a subsidy when the transport charges are on terms more favorable than for *any comparable* domestic shipments. Fourth, the statutory provision goes on to list the provision of services and the assumption of distribution costs as domestic subsidies which are subsidies within the meaning of the Trade Agreements Act if provided, *inter alia,* to an industry or even a group of industries. It is plausible to consider a preferential transport rate as falling within these latter categories or, at the very least, as being so closely analogous that it would be impossible to think that its availability to an entire industry rather than just the export segment could save it from being a countervailable subsidy.

### IV

For the reasons earlier expressed, the Court concludes that for steel exported after April 1, 1982, a final determination should not have been reached if the ITA was of the opinion that the rail rate preference given to that steel had been eliminated during the investigation. The proper course was to follow the procedures of section 704 (19 U.S.C. § 1671c) and suspend the investigation of those subsidies found to have been eliminated. Nevertheless, because the Court also finds that the rail rate

governments, on terms more favorable than for domestic shipments.

subsidy was *not* eliminated within the meaning of the law, it remands the matter for a continuation of the investigation on that subject.

During this renewed investigation, for steel exported on or after April 1, 1982, the ITA shall maintain the suspension of liquidation ordered in the preliminary determination of June 10, 1982, and shall require the deposit of estimated duties in the amounts set out in the preliminary determinations for products exported after April 1, 1982. 47 Fed.Reg. at 26,343. This will restore matters to the condition in which they were following the preliminary determination. It will allow the investigation to proceed from that point to a final determination or to a suspension of the investigation, in either event, taking into account the views expressed in this opinion.