724 F. Supp. 1407

COMEAU SEAFOODS LTD., ST. MARY'S BAY FISHERIES LTD., NATIONAL SEA PRODUCTS LTD., AND FISHERIES COUNCIL OF CANADA, PLAINTIFFS *v.* UNITED STATES, DEFENDANT

Court No. 86–06–00751

(Decided October 27, 1989)

*O'Melveny & Myers (Richard G. Parker, Gary N. Horlick, Debra A. Valentine, Sheila J. Landers* and *Robert E. Sims)* for plaintiffs.

---

*Stuart E. Schiffer,* Acting Assistant Attorney General; *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (*A. David Lafer*); of counsel: *Jean Heilman Grier,* Attorney-Advisor, Office of the Chief Counsel for International Trade, U.S. Department of Commerce, for defendant.

## OPINION

TSOUCALAS, *Judge:* Plaintiffs challenge the final affirmative countervailing duty determination by the United States Department of Commerce, International Trade Administration ("ITA" or "Commerce") in *Certain Fresh Atlantic Groundfish from Canada,* 51 Fed. Reg. 10,041 (Dep't Comm. 1986) (final affirmative determination). The action is before the Court on plaintiffs' motion for judgment on the agency record pursuant to Rule 56.1 of the Rules of this Court.

## BACKGROUND

The North Atlantic Fisheries Task Force ("Task Force" or "petitioner")[1] filed a petition on August 5, 1985 with Commerce on behalf of the domestic industries which harvest and process fresh Atlantic groundfish ("groundfish"), in whole and in fillet form. A.R. Doc. 1 at 26. The petition alleged that the Canadian groundfish industry received benefits which constituted countervailable subsidies within the meaning of section 701 of the Tariff Act of 1930, *as amended,* 19 U.S.C. § 1671 (1982 & Supp. V 1987). These benefits were provided by the Federal Government of Canada and by the provincial governments of Nova Scotia, Newfoundland, New Brunswick, Prince Edward Island, and Quebec. A.R. Doc. 1 at 26.

After reviewing the petition, Commerce concluded that sufficient grounds existed upon which to initiate a countervailing duty investigation to determine whether the Canadian producers of groundfish, in whole and in fillet form, received benefits which constituted subsidies within the meaning of the countervailing duty law. *Certain Fresh Atlantic Groundfish from Canada,* 50 Fed. Reg. 35,281 (Dep't Comm. 1985) (initiation of investigation). Commerce preliminarily determined that countervailable benefits were provided, *Certain Fresh Atlantic Groundfish from Canada,* 51 Fed. Reg. 1010 (Dep't Comm. 1986) (preliminary affirmative determination), and notified the United States International Trade Commission ("ITC") of its determination.[2] The estimated net subsidy was determined to be 6.85% *ad valorem.*[3] 51 Fed. Reg. 1010 (preliminary).

---

[1]The petitioner is an unincorporated association representing fishermen, fishermen's cooperatives and processors located in the northeastern United States. Administrative Record Document 1 at 28 ("A.R. Doc. —— at ——"). When the Task Force filed the petition, it listed fifteen members, including harvesters of groundfish and persons affiliated with various trade associations. *See* A.R. Doc. 1, Exhibit 1.

[2]Since Canada is a "country under the Agreement" under 19 U.S.C. § 1671(b), the ITC is required to determine whether imports of the subject merchandise from Canada materially injure, or threaten material injury to, a United States industry. 19 U.S.C. § 1671(a).

[3]The investigation covered certain fresh whole and fresh fillets of Atlantic groundfish, including cod, haddock, pollack, hake and flatfish (including flounder and sole). 51 Fed. Reg. at 10,043 (final). These species are referred to as "groundfish" because they live on or near the seabed. *Id.* The term "fresh" includes fish that are chilled, but excludes fish that have been frozen. *Id.*

On March 24, 1986, Commerce issued its final affirmative countervailing duty determination, finding that certain fresh whole Atlantic groundfish and certain fresh Atlantic groundfish fillets imported from Canada were receiving benefits which constituted subsidies under the countervailing duty law. 51 Fed. Reg. 10,041 (final). Commerce found fifty-five programs to confer subsidies: eleven federal programs, six joint federal-provincial programs, and thirty-eight provincial programs. 51 Fed. Reg. at 10, 042 (final).

The ITC, subsequent to notification from Commerce, and after its own investigation, found that imports of certain fresh whole Atlantic groundfish from Canada were materially injuring an industry in the United States. *See Certain Fresh Atlantic Groundfish from Canada,* 51 Fed. Reg. 17,785 (Dep't Comm. 1986) (countervailing duty order). Imports of certain fresh groundfish fillets, however, were found not materially injuring, threatening material injury to, or materially retarding the establishment of a U.S. industry. *Id.* Therefore, Commerce's countervailing duty order embraced only entries of fresh *whole* Atlantic groundfish from Canada. The estimated net subsidy was found to be 5.82% *ad valorem.* 51 Fed. Reg. at 10,041 (final).

Plaintiffs challenge the subsidy findings concerning four programs: two federal programs, one joint federal-provincial program and one provincial program.[4] Plaintiffs contend that Commerce's findings regarding certain fresh whole Atlantic groundfish from Canada with respect to these programs are neither reasonable, nor supported by substantial evidence on the record, nor in accordance with law. The following issues are present before the Court for determination:

(1) whether Commerce's determination that the petition was filed "on behalf of an industry" pursuant to 19 U.S.C. § 1671a(b)(1) was reasonable, supported by substantial evidence on the record, and in accordance with law;

(2) whether plaintiffs' challenges are moot, therefore, judicially unreviewable; and,

(3) whether Commerce's affirmative determinations regarding the following programs are reasonable, supported by substantial evidence on the record, and in accordance with law:

> (A) the Industrial and Regional Development Program;
> (B) subsidiary agreements concluded pursuant to Economic and Regional Development Agreements;
> (C) loans from the Fisheries Loan Board for the fishing industry in the Province of Newfoundland; and,
> (D) government equity infusions into National Sea Products Limited and Fishery Products International Limited.

---

[4] The four programs are the following: (1) the Industrial and Regional Development Program; (2) Economic and Regional Development Agreements; (3) Newfoundland: Loans from the Fisheries Loan Board; and (4) Government Equity Infusions into National Sea Products Limited and Fishery Products International Limited. 51 Fed. Reg. at 10,042 (final).

## STANDARD OF REVIEW

The standard of review in the instant action, commenced pursuant to 19 U.S.C. § 1516a(a)(2), (a)(3) (1982 & Supp. V 1987), is provided under 19 U.S.C. § 1516a(b)(1)(B) (1982) which requires the Court to hold unlawful any determination, finding, or conclusion found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co.* v. *United States*, 3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (1984) (quoting *Consolidated Edison Co.* v. *NLRB*, 305 U.S. 197, 229 (1938)). It is also well settled that

> [a]n agency's interpretation of a statute which it is authorized to administer is "to be sustained unless unreasonable and plainly inconsistent with the statute, and [is] to be held valid unless weighty reasons require otherwise." An agency's "interpretation of the statute need not be the *only* reasonable interpretation or the one which the court views as the most reasonable."

*Al Tech Specialty Steel Corp.* v. *United States*, 11 CIT 372, 375, 661 F. Supp. 1206, 1208 (1987) (quoting *ICC Indus.* v. *United States*, 812 F.2d 694, 699 (Fed. Cir. 1987)) (emphasis in original).

## STANDING

A countervailing duty proceeding is commenced whenever an interested party files a petition "*on behalf of* an industry, which alleges the elements necessary for the imposition of the duty * * * and which is accompanied by information reasonably available to the petitioner supporting those allegations." 19 U.S.C. § 1671a(b)(1) (emphasis added).[5]

Plaintiffs contend that Commerce contravened § 1671a(b)(1) by simply assuming petitioners had standing without affirmatively establishing that the petition was, in fact, filed "on behalf of" the industry. Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Judgment on the Agency Record at 15 ("Plaintiffs' Memorandum"). According to plaintiffs, the decision in *Gilmore Steel Corp.* v. *United States*, 7 CIT 219, 585 F. Supp. 670 (1984), requires that Commerce must dismiss petitions not proven to be affirmatively supported by a majority of the domestic industry.[6] The Court disagrees with plaintiffs' reading of *Gilmore*.

The *Gilmore* court established that in order to file a valid petition, a petitioner must not only "be a member of the affected industry, i.e., be an 'interested party,' it must also show that a majority

---

[5]"Industry" is defined as the "domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product * * *." 19 U.S.C. § 1677(4)(A). Plaintiff does not dispute that the Task Force qualifies as an interested party.

[6]Commerce maintains it is not required to establish affirmatively that a petitioner has the support of a majority of a particular industry. Rather, Commerce insists that it need only rely on petitioner's representation to that effect, "until it is affirmatively shown that this is not the case." 51 Fed. Reg. at 1011 (preliminary).

of that industry backs its petition." 7 CIT at 226, 585 F. Supp. at 676. The court has since determined, however, that Commerce "*has discretion to dismiss, but is not required to dismiss,* petitions that are not shown to be actively supported by a majority of the domestic industry." *Citrosuco Paulista, S.A.* v. *United States.* 12 CIT 1196, 1205, 704 F. Supp. 1075, 1085 (1988) (emphasis added) (interpreting both *Oregon Steel Mills Inc.* v. *United States,* 862 F.2d 1541 (Fed. Cir. 1988), and *Gilmore*); *see also Sandvik AB* v. *United States,* 13 CIT 738, 742, Slip Op. 89–131 at 10 (Sept. 14, 1989); *Vitro Flex, S.A.* v. *United States,* 13 CIT 430, 436, 714 F. Supp. 1229, 1235 (1989). Furthermore, the *Citrosuco* court affirmed the following position advanced by Commerce in *Frozen Concentrated Orange Juice from Brazil,* 52 Fed. Reg. 8324, 8325 (Dep't Comm. 1987) (final determination):

> there is nothing in the statute, its legislative history, or our regulations which requires that petitioners establish affirmatively that they have the support of a majority of their industries. In many cases, such a requirement would be so onerous as to preclude access to import relief under the antidumping and countervailing duty laws.

12 CIT at 1205, 704 F. Supp. at 1085.

The Court in this action is impelled to ascribe to the reasoning advanced in *Citrosuco.* The legislative history of § 1671 makes clear that Congress intended petitions filed "to result in investigations being initiated unless the authority [was] convinced that the petition and supporting information fail[ed] to state a claim upon which relief [could] be granted under § 701 [19 U.S.C. § 1671] or the petitioner [did] not provide information supporting the allegations which [was] reasonably available to him." S. Rep. No. 249, 96th Cong., 1st Sess. 2, *reprinted in* 1979 U.S. Code Cong. & Admin. News 381, 433.

Commerce examined the petition, and found it to meet these requirements. 50 Fed. Reg. at 35,282 (initiation). The petition contained sufficient evidence indicating the Canadian groundfish industry was in receipt of government assistance, potentially as part of a social welfare approach to the Canadian fishing industry. *See* A.R. Doc. 1 26–27. The petition also contained statistics reflecting an escalation of Canadian groundfish imports, which gained an increasingly greater share of the United States market. *See* A.R. Doc. 1. Therefore, sufficient information existed upon which to initiate an investigation.

Plaintiffs also incorrectly claim opposition to the petition rose to a level indicating that petitioner did not represent a majority of the industry. Various individual members of the domestic industry and the Task Force for the Survival of American Fishermen ("TSAF"), challenged petitioner's capacity to represent the domestic groundfish industry. However, Commerce rightly observed that the

opposition's position logically derived from their status as importers; issuance of a countervailing duty order covering groundfish would result in these entities being liable for the payment of countervailing duties. 51 Fed. Reg. at 1011 (preliminary). In addition, Commerce discovered that the TSAF opposed terminating the investigation only with respect to groundfish fillets, not whole groundfish, the subject of the instant action. *Id.* Therefore, the Court cannot find that Commerce acted unreasonably. Plaintiffs have not adequately rebutted Commerce's finding that the petition was filed on behalf of the domestic industry.

## MOOTNESS

Defendant contends that regardless of petitioner's standing, the case is moot because any change in the cash deposit rate resulting from this Court's decision would have no prospective effect on the liquidation or deposit rate of future entries. The only means of challenging the duty assessment rate established in a final countervailing duty determination, defendant proclaims, is through the administrative review process of 19 U.S.C. § 1675(a) ("751 review").[7] Since plaintiffs made no request for a 751 review, defendant reasons plaintiffs have waived their right to contest the liquidation of entries at the rate deposited, and accept the deposit rate as a substitute for a rate determined after full review.[8]

The Court disagrees. Plaintiffs have challenged Commerce's final affirmative countervailing duty determination and order under 19 U.S.C. § 1516a(a)(2) and (a)(3). In challenging this determination, plaintiffs dispute both Commerce's decision to countervail the entries of whole groundfish and the valuation methodology employed. Judicial review over final affirmative determinations, including *any negative part* thereof, is expressly provided in 19 U.S.C. § 1516a(a)(2)(B)(i). If the Court then determines that all or part of the determination is incorrect, entries covered by a correction of that determination "shall be liquidated in accordance with the final court decision * * *." 19 U.S.C. § 1516a(e). Thus, if the methodology Commerce employed resulted in the posting of an incorrect deposit rate, Commerce must correct its mistake. All future entries are subject to the corrected rate. This means that if no request for an administrative review is received, the regulations provide that the Secretary of Treasury will instruct Customs to assess countervailing

---

[7]A final affirmative countervailing duty determination establishes the basis for a countervailing duty determination order and sets the estimated duty rate. *PPG Indus., Inc. v. United States*, 11 CIT 303, 307, 660 F. Supp. 965, 974 (1987). These rates "are used initially only as the basis for the collection of bond or cash deposits of *estimated duties* on entries made on or after the date of publication of the affirmative preliminary or final * * * determination." *Oki Elec. Indus. Co. v. United States*, 11 CIT 624, 627, 669 F. Supp. 480, 482 (1987) (emphasis in original).

"The results of such administrative reviews serve as the basis for actual duty assessments with regard to the entries covered by the particular determination and as the basis for cash deposits of estimated duties for future entries." *Alhambra Foundry v. United States*, 10 CIT 330, 331, 635 F. Supp. 1475, 1476 (1986) (quoting *Silver Reed America, Inc. v. United States*, 9 CIT 221, 224 (1985)).

[8]*Defendant's* believes that since the 751 review establishes the "actual rate" of duties, whereas the rate determined in the investigation is only the "estimated rate," the only way to obtain prospective effect of a change in the rate is through the 751 review process.

duties on the merchandise "at rates equal to the cash deposit of (or bond for) estimated countervailing duties required on that merchandise at the time of entry, or withdrawal from warehouse, for consumption and to continue to collect the cash deposit previously ordered." 19 C.F.R. § 355.10(d) (1987). If the rate happens to be different than the Court corrected rate, the merchandise will be liquidated at the corrected rate. To hold otherwise would render § 1516a(e) meaningless with respect to challenges to a determination which result in a change to the deposit rate.

Defendant confuses the application of *British Steel Corp.* v. *United States,* 10 CIT 661, 647 F. Supp. 928 (1986), *appeal dismissed as moot,* No. 87–1050 (Fed. Cir. Apr. 1, 1987), to this action. The *British Steel* court stated:

> [i]f a party believes that the estimated duty deposit rate is erroneous, the prescribed procedure is that such party request an administrative review in the manner provided by the regulations. Failing that, the unreviewed entries must be liquidated as provided in the regulations.

*Id.* at 664, 647 F. Supp. at 931; *see also Fundicao Tupy S.A.* v. *United States,* 11 CIT 561, 669 F. Supp. 437 (1987), *appeal dismissed as moot,* 841 F.2d 1011 (1988); *PPG,* 11 CIT 303, 660 F. Supp. 965; *Silver Reed,* 9 CIT 221. However, the *British Steel* court dealt with an entirely different issue than is present here. Plaintiff therein sought to enjoin liquidation of goods entered in 1985–86 pending resolution of its claim that Commerce improperly refused to conduct a 751 review with respect to those entries. 10 CIT at 665–66, 647 F. Supp. at 931. The underlying action, however, challenged Commerce's final affirmative determination of April 27, 1983. The court properly held that it lacked jurisdiction because the countervailing duty assessment rate of the 1985–86 entries was not governed by the 1983 countervailing duty determination contested in that action, but by the results of the first annual section 751 review. *Id.*

It is well settled that once countervailing duty rates are established in a 751 review, "neither the actual assessment of duties nor the estimation of duty rates for future entries are based on the net subsidy determined in the final countervailing duty order and determination." *PPG,* 11 CIT at 309, 660 F. Supp. at 970 (citing *Alhambra Foundry,* 10 CIT 330, 635 F. Supp. 1475). In the instant action, however, there has been no such intervening 751 review. An interested party, therefore, may challenge Commerce's final determination in this Court, including the methodology employed, and have the results of any rate change apply prospectively to liquidations made pursuant to the final determination. "It is only when a 751 review has been completed that judicial scrutiny of the previous underlying countervailing duty order as to deposit rates is rendered moot." *PPG,* 11 CIT at 314, 660 F. Supp. at 973 n.5.

930

Plaintiffs challenge whether four programs provided by the Federal Government of Canada and the provinces to the groundfish industry are countervailable: (1) the Industrial and Regional Development Program; (2) Economic and Regional Development Agreements; (3) Newfoundland: Loans from the Fisheries Loan Board; and (4) Government Equity Infusions into National Sea Products Limited and Fishery Products International Limited. The first three programs involve a question of whether the benefits were "provided to a specific enterprise or industry, or group of enterprises or industries" within the meaning of 19 U.S.C. § 1677(5)(B) (1982). Regarding the fourth program, the question entails whether government equity infusions in National Sea Products Limited and Fishery Products International Limited were on terms consistent with commercial considerations and not a subsidy under § 1677(5)(A)(ii)(I).

## I. *Industrial and Regional Development Program:*

Under the administration of the Department of Regional and Industrial Expansion ("DRIE"), the Industrial and Regional Development Program ("IRDP") was established in 1983 for the purpose of "increas[ing] industrial development and improv[ing] the overall economic climate in Canada."[9] 51 Fed. Reg. at 10,045 (final).

Canada implemented the IRDP by classifying each of its 260 census districts into one of four tiers based on their relative economic development. The following three criteria were used for classification purposes: (1) the per capita level of income in the district; (2) the level of unemployment in a district; and, (3) the capacity of the province in which the district is located to raise revenue. *See* A.R. Doc. 100 at 2699.

Tier IV census districts consisted of the most economically disadvantaged five percent of the population, and received the highest level of assistance under the IRDP. A.R. Doc. 100 at 2694. The districts in which the next fifteen percent of the population were classified constituted Tier III districts; the next thirty percent were assigned to Tier II, and the lowest level of assistance was provided to the remaining fifty percent of the population which resides in Tier I. *Id.;* 51 Fed. Reg. at 10,045 (final).

The ITA determined that the grant program was countervailable because it provided preferential regional subsidies, despite the neutrality of application of the criteria for assignment to a tier. *Id.* Plaintiffs dispute the legality of finding a program countervailable because of its regional nature. Plaintiffs' Memorandum at 32–33. In addition, plaintiffs contend that the IRDP is not countervailable because assignment to a tier is based on statutorily-mandated neutral

[9]To accomplish this goal, grants were provided for the following purposes: (1) to encourage the development of new products and new processes and to increase industrial productivity and industrial competitiveness; (2) to assist in the establishment of new production facilities in less developed areas; (3) to increase industrial productivity through the improvement, modernization and expansion of existing manufacturing and processing operations; and, (4) for marketing purposes. 51 Fed. Reg. at 10,045 (final).

criteria, and that no particular region in Canada is targeted for assistance since census districts may move from one tier to another, from year to year. Plaintiffs' Memorandum at 41–43.

Under 19 U.S.C. § 1677(5)(B), a domestic subsidy exists if a benefit is provided or required by governmental action "to a specific enterprise or industry, or group of enterprises or industries" (the "specificity test"). *See Alberta Pork Producers' Mktg. Bd.* v. *United States,* 11 CIT 563, 567, 669 F. Supp. 445, 450 (1987); *PPG Indus., Inc.* v. *United States,* 11 CIT 344, 350, 662 F. Supp. 258, 264 (1987). The specificity test has been held to apply to regional preference programs. *Hercules, Inc.* v. *United States,* 11 CIT 710, 735, 673 F. Supp. 454, 476 (1987)[10] (citing *United States Steel Corp.* v. *United States,* 5 CIT 245, 254, 566 F. Supp. 1529, 1537 (1983); *ASG Indus., Inc.* v. *United States,* 67 CCPA 11, C.A.D. 1237, 610 F.2d 770 (1979); *Carlisle Tire and Rubber Co.* v. *United States,* 5 CIT 229, 233, 564 F. Supp. 834, 838 (1983)).

In determining whether the IRDP is countervailable, the Court "must examine the *actual results* or effects of assistance provided * * * and not [its] purposes or intentions." *Cabot Corp.* v. *United States,* 9 CIT 489, 495, 620 F. Supp. 722, 730 (1985) (emphasis added). Thus, the test is a *de facto* case by case analysis of the benefits conferred, not the program's nominal general availability.[11] 19 U.S.C. § 1677(5)(B); *Alberta Pork,* 11 CIT at 567, 669 F. Supp. at 450; *Can-Am Corp.* v. *United States,* 11 CIT 424, 428, 664 F. Supp. 1444, 1448 (1987); *PPG,* 11 CIT at 352, 662 F. Supp. at 265; *Cabot,* 9 CIT at 498, 620 F. Supp. at 732. It must also be kept in mind that Commerce has been given considerable discretion in determining what practices are countervailable. *See Can-Am Corp.,* 11 CIT at 429, 664 F. Supp. at 1449; *Carlisle Tire,* 5 CIT at 232, 564 F. Supp. at 837.

The IRDP provides grants to different regions at different funding levels according to their tier designation. The level of funding available to an eligible applicant is determined by geographic region. Thus, the applicant's region determines the level of assistance. That the distinctions are based on neutral criteria does not change the preferential nature of the program.

> [G]eneral availability is not the statutory test. It is merely one of several relevant factors to be considered in determining whether or not a benefit or competitive advantage has been

---

[10]In *Hercules, Inc.* the court found the program to confer countervailable benefits for grants specifically designated for "enterprises or industries" grouped according to regions in France. 11 CIT at 736, 673 F. Supp. at 477.

Commerce looks for evidence of "targeting," and has "consistently held that benefits provided on a regional basis are, by their very nature, provided to a specific group of enterprises or industries." 51 Fed. Reg. at 10,066 (final), *e.g., Industrial Nitrocellulose from France,* 52 Fed. Reg. 833, 842 (Dep't Comm. 1987) (final administrative review); *Lamb Meat from New Zealand,* 50 Fed. Reg. 37,708, 37,710 (Dep't Comm. 1985) (final affirmative determination and order); *Certain Steel Products from Belgium,* 47 Fed. Reg. 39,304, 39,313 (Dep't Comm. 1982) (final affirmative determination).

[11]The term "general availability" means "that what is available is accessible to all who are similarly situated." *United States Steel Corp.,* 5 CIT at 255, 566 F. Supp. at 1537.

conferred upon a "specific enterprise or industry, or group of enterprises or industries."

*Alberta Pork,* 11 CIT at 567, 669 F. Supp. at 450 (citations omitted).

Commerce determined the level of benefit by comparing the level of assistance provided to fresh fish producing companies in Atlantic Canada to the average level of assistance provided to Tier I companies, and allocated the difference over a twelve year period. 51 Fed. Reg. at 10,045 (final). The designations are not simply provided as an administrative convenience.[12]

Commerce's determination that benefits received by the groundfish industry under the IRDP constitute subsidies within the meaning of 19 U.S.C. § 1677(5)(B) is supported by substantial evidence on the record and in accordance with law. This result is not altered by the potential fluctuations, in principle, which may occur within a particular tier from year to year. *Cf. Certain Steel Products from the Netherlands,* 47 Fed. Reg. 39,372, 39,376 (Dep't Comm. 1982) (final negative determination) (different utility rates in five different zones are not preferential because there are various industrial users in each zone).

II. *Economic and Regional Development Agreements:*

Economic and Regional Development Agreements (ERDAs) are essentially a continuation of the General Development Agreements ("GDAs"),[13] that the Federal Government signed with every province and territory in the early 1980's. 51 Fed. Reg. at 10,049 (final); A.R. Doc. 100 at 1192–93. ERDAs are implemented through subsidiary agreements between the federal and individual provincial governments. They are designed to "establish programs, delineate administrative procedures and set up the relative funding commitments of the federal and provincial governments." 51 Fed. Reg. at 10,049 (final).

The subsidiary agreement in question here, signed between the Federal Government of Canada and Prince Edward Island ("PEI"), relates to the development of the fisheries industry.[14] Commerce applied the specificity test to this subsidiary agreement and found the program countervailable.[15] *Id.* Plaintiffs take issue with the application of the specificity test to each subsidiary agreement and argue that Commerce should have applied the test to the program as a

---

[12]Plaintiffs attempt to draw a parallel to *Certain Steel Products from the Federal Republic of Germany,* 47 Fed. Reg. 39,345 (Dep't Comm. 1982) (final affirmative determination), where regional designations were provided for administrative convenience. Despite the regional designations, however, the assistance was in actuality provided on identical terms across Germany, as part of a national unemployment plan. 47 Fed. Reg. at 39,349–50. Plaintiffs' attempted analogy, therefore, fails on the facts. In the instant action, there is a preferential predetermination of benefits based on which tier a specific district falls. Therefore, the regional designation is not merely an administrative convenience, but a designation which results in greater benefits provided to a specific region.

[13]GDAs are umbrella agreements which provide the legal basis for departments of the federal and provincial governments to cooperate in the establishment of economic development programs with stated general economic development goals. 51 Fed. Reg. at 10,048 (final).

[14]Under the PEI subsidiary agreement, four programs were funded by the Federal Government of Canada: resource development, harvesting, infrastructure and pilot projects. *Id.* Three programs were funded by the provincial government: quality enhancement, quality improvement and product utilization. *Id.*

[15]Commerce found conflicting documentation regarding the total monies disbursed, and used the best information available, a 1984–1985 ERDA Review Report, to establish the aggregate amount of funding. *Id.*

whole, and not the individual parts thereof. Plaintiffs' Memorandum at 48.

Plaintiffs are in error. In *Ipsco, Inc.* v. *United States,* 12 CIT 359, 379, 687 F. Supp. 614, 631–32 (1988), the court affirmed Commerce's practice of focusing on the subsidiary agreement as the proper level of analysis in assessing the countervailability of GDAs.

> Where the terms of [a] program do not appear to be limited to a specific group of enterprises or industries, it may still be countervailable if its benefits are, in practice, bestowed upon a specific group of enterprises or industries.

*Id.* at 379–380, 687 F. Supp. at 632 (citing *PPG,* 11 CIT at 352, 662 F. Supp. at 265). Plaintiffs attempt to distinguish *Ipsco* based on "the absence of evidence in the record of that case that other agreements were in existence at the time of investigation." Reply Brief of Plaintiffs Comeau Seafoods, Ltd., *et al.,* in Support of Plaintiffs' Motion for Judgment on the Agency Record at 13 n.18 ("Plaintiffs' Reply"). Plaintiffs' attempt fails, however, because the determinative issue is *at what level* Commerce may apply the specificity test. The *Ipsco* court clearly held that this may be at the subsidiary level for the purpose of ascertaining preference to a particular industry.

The Court must examine the aid or advantage actually received "regardless of whatever name or in whatever manner or form or for whatever purpose the aid was provided." *Cabot,* 9 CIT at 495, 620 F. Supp. at 730 (quoting *Nicholas & Co.* v. *United States,* 7 Ct. Cust. Appls. 97, 106, *aff'd,* 249 U.S. 34 (1916)). Here, Commerce calculated the benefit under the PEI fishery subsidiary agreement, by allocating the total value of all federal and provincial funds received in fiscal year 1985 over twelve years. Commerce found an estimated net subsidy of 0.007% *ad valorem* by applying the grant methodology and dividing by the f.o.b. value of production in Atlantic Canada of fish and shellfish during the review period. 51 Fed. Reg. at 10,050 (final). This methodology is in keeping with the guidelines provided in the subsidies index. *See Subsidies Appendix, Cold-Rolled Carbon Steel Flat-Rolled Products from Argentina,* 49 Fed. Reg. 18,006, 18,016 (Dep't Comm. 1984) (final affirmative determination and order). Thus, the Court cannot conclude that Commerce erred in its analysis of the benefit under the PEI fishery subsidiary agreement.

The distinction that has evaded plaintiffs is that not all generally available benefits are alike. Generally available benefits may accrue to specific recipients. "[W]hen actually bestowed, [the benefit] may constitute specific grants conferred upon specific identifiable entities, which would be subject to countervailing duties." *Cabot,* 9 CIT at 497, 620 F. Supp. at 731. The Court holds that Commerce properly concluded that the level of analysis was the subsidiary agreement; its findings are based on substantial evidence, and in accordance with law.

III. *Newfoundland: Loans from the Fisheries Loan Board:*

Under the direction of the Fisheries Loan Board ("FLB"), the government of Newfoundland makes available long-term loans "for the development and improvement of the fishing industry." 51 Fed. Reg. at 10,052 (final). These loans are designed for Newfoundland resident commercial fishermen who have had 75% of their income derived from the harvesting industry during the previous two fishing seasons. The loans are provided for the following purposes:

> the purchase, construction and repair of ships measuring up to 65 feet, the purchase of new engines and fishing gear, the construction of plants and purchase of plant equipment, and for other types of capital expenditures.

*Id.* Commerce applied the specificity test and found the FLB loans countervailable because they were limited to one particular industry—the fishing industry. *Id.*

Plaintiffs, however, claim that the FLBs are noncountervailable because they are *de facto* nonspecific and only part of an overall lending policy, administered through the Rural Development Loan Program ("RDLP"), which provides loans on similar terms to all commercial enterprises in Newfoundland.

The record supports plaintiffs' conclusion. The province of Newfoundland established a major program, the RDLP, to aid in the development of small businesses involved in "primary resource production, manufacturing, processing, services and tourism." 51 Fed. Reg. at 10,061 (final). Commerce applied the specificity test to the RDLP and found it "not limited to a specific enterprise or industry * * *." *Id.* Fish harvesters, however, were specifically excluded from the RDLP because "the FLB is responsible for administering loans to fish harvesters due to the detailed technical specifications which must be met." A.R. Doc. 100 at 2025. Thus, the exclusion was apparently solely to utilize the special expertise of the FLB.

There is no evidence in the record that this exclusion was for the purpose of specifically targeting the fish harvesting industry. The Court is cognizant, however, that despite the programs' general availability, the loans accorded the whole groundfish industry may provide a *de facto* countervailable benefit. Therefore, Commerce erred in applying the commercial rate of interest as the benchmark for calculating the amount of subsidy, and must recalculate the benefit conferred using the rate of interest used in the RDLP.

IV. *Government Equity Infusions:*

The Government of Canada, along with the province of Nova Scotia and the province of Newfoundland, made equity investments into two restructured companies: National Sea Products Limited ("NSP") and Fishery Products International Limited ("FPIL"), respectively. The provision of equity "was part of the restructuring of several major harvesters and processors into NSP and FPIL." 51 Fed. Reg. at 10,047 (final). Commerce made the following findings:

During the late 1970's, the five major companies rapidly increased their debt, principally through loans from commercial banks. By the early 1980's, with a downturn in the industry, the position of the companies became an item of concern to the commercial banks, and subsequently to the federal government, because their especially high debt-to-equity ratios began to affect the economic underpinnings of the companies and the Atlantic Canada fishing industry. In 1983, the federal government established a restructuring team in response to the depressed economic conditions of the industry. The federal restructuring team determined that the financial structure of the major companies was ill-suited to the economic conditions which faced the fishing industry, and that the principal challenge to the companies was to increase shareholders' equity to ensure the companies' economic viability. They also believed that liquidation would result in extremely serious disruptions to employment and financial institutions in Atlantic Canada. The government of Canada states that, based on the long-term prospects of this industry and the financial forecasts prepared for NSP and FPIL, equity participation by the government appeared to be a sound investment.

51 Fed. Reg. at 10,047 (final).

Government provision of equity does not *per se* confer a countervailable benefit. *Steel Products from Argentina*, 49 Fed. Reg. at 18,020; *Certain Agricultural Tillage Tools from Brazil*, 50 Fed. Reg. 34,525, 34,529 (Dep't Comm. 1985) (final affirmative determination). Government equity infusions bestow countervailable benefits only when they are made "on terms inconsistent with commercial considerations." 19 U.S.C. § 1677(5)(A)(ii)(I). Although the phrase "inconsistent with commercial considerations" is not defined in the statute, the test is whether "a reasonable investor could expect a reasonable rate of return on his investment within a reasonable period of time." *British Steel Corp.* v. *United States*, 10 CIT 224, 226, 632 F. Supp. 59, 61 (1986).

Commerce, in determining whether the investments here were made on terms inconsistent with commercial considerations, analyzed the following: (a) the companies' financial statements; (b) the financial forecasts submitted by the Government of Canada; and, (c) the terms of the restructuring. 51 Fed. Reg. at 10,047 (final).

A. *FPIL:*

Three major companies were involved in the restructuring of FPIL in 1984.[16] Commerce found FPIL to be unequityworthy at the time of its organization for two reasons: (1) the poor financial conditions of the companies merged into FPIL during 1981–83; and (2) the results of Commerce's analysis of the projected future profitability of the company.

---

[16]Fishery Products Limited, The Lake Group Limited, and John Penny and Sons Limited of Newfoundland. 51 Fed. Reg. at 10,047 (final). *But see* A.R. Doc. 223 at 2380 (ten companies, in total, were amalgamated to form FPIL).

In determining whether the assumptions underlying the government's investments were valid, plaintiffs argue that Commerce should not have based its decision on the past results of five poorly managed companies, but recognize FPIL as a new entity. To support their position, plaintiffs rely on *Carbon Steel Wire Rod from Trinidad and Tobago,* 49 Fed. Reg. 480 (Dep't Comm. 1984) (final affirmative determination). In *Trinidad and Tobago,* Commerce found that government assistance made to a newly created company did not constitute a countervailable subsidy. However, *Trinidad and Tobago* is distinguishable because the company under consideration there was not previously in operation as another entity, but was an entirely new company. *See* 49 Fed. Reg. at 480–81. Furthermore, *Trinidad and Tobago* is limited to its own facts. *See Saudi Iron and Steel Co.* v. *United States,* 11 CIT 880, 892, 675 F. Supp. 1362, 1373 (1987).

In the instant action, both FPIL and its holding companies had been in operation, and required restructuring and government assistance to remain viable. The corporate form may have changed such that, technically, a new company was formed, but the fact remains that the new company comprised the old companies. Therefore, it was reasonable for Commerce to look at the past pattern of performance of the companies in ascertaining whether they would make a reasonable investment. The whole is equal to the sum of its parts; the same industry was involved, with many of the same assets.

The governments' primary source of projected future profitability of FPIL consisted of a study performed by the independent consulting firm of Price Waterhouse. A.R. Doc. 224 at 2382. Plaintiffs contend that the Price Waterhouse study provided a positive financial projection which demonstrated that FPIL would show strong earnings in five years.[17]

Commerce, however, examined the Price Waterhouse study and found that even though greater profits were forecast for the later years, FPIL was expected to experience losses or low profits in the first two years of operations. A.R. Doc. 224 at 2382. Thus, Commerce found that these later expected profits were not sufficient to compensate for the delay in reaching that level of performance. *Id.*

> The projected increase in retained earnings over five years is not large and is accompanied by a deterioration in the financial structure and working capital position of the company. The government estimates of future catches on which these projections were based are subject to great uncertainty.

51 Fed. Reg. at 10,047 (final); *see also* A.R. Doc. 224 at 2382–83. In addition, Commerce observed that private investors had been sought, yet none had been willing to invest in the restructured company. A.R. Doc. 228 at 2402; 51 Fed. Reg. at 10,047. Under the cir-

---

[17]Commerce found the methodology used in the study sound and the assumptions, when examined individually, reasonable. A.R. Doc. 224 at 2382.

cumstances, Commerce acted rationally in finding that the equity infusions by Canada and the province of Newfoundland were not made in a manner consistent with commercial considerations.

B. *National Sea Products:*

The next equity investment decision made by Commerce concerns the reorganization of NSP. The restructuring occurred in 1983 and "involved primarily NSP itself and the acquisition of certain assets from H.B. Nickerson & Sons Limited." 51 Fed. Reg. at 10,047 (final). The Federal Government of Canada, the province of Nova Scotia and a private sector group, Scotia Investments Limited ("SIL"), invested equity in NSP in exchange for shares of common and/or preferred stock. Initially, SIL offered to purchase two million shares of NSP common stock at five dollars per share, with no purchase of second preferred shares or government involvement. The offer was rejected because it was believed that this additional equity was not sufficient to ensure the recovery of NSP. A.R. Doc. 224 at 2387. Consequently, SIL increased its purchase to three million common shares at fives dollars per share,[18] and Canada, Nova Scotia and SIL provided additional equity in exchange for second preferred shares.[19] Commerce found these equity infusions to be on terms inconsistent with commercial considerations, therefore, countervailable.[20] 51 Fed. Reg. at 10,047 (final).

Plaintiffs contend that since the governments paid the same price for the second preferred shares at SIL, the governments' equity infusions were on terms consistent with commercial considerations. Plaintiffs argue that the instant action is controlled by *Carbon Steel Structural Shapes from Luxembourg,* 47 Fed. Reg. 39,364 (Dep't Comm. 1982) (final affirmative determination). In that investigation, Commerce found government equity investments not countervailable because the private investor and the government paid the same price for the stock, thereby indicating that the purchase was not made under terms inconsistent with commercial considerations. 47 Fed. Reg. at 39,368.

However, the Court agrees with Commerce in that the analysis cannot stop at the mere presence of a private investor or payment of the same price for shares by the private investor, but must focus on the substances of the transaction. The record reflects that SIL's purchase of common shares provided it a greater potential for return on its investment. In this regard, SIL and the governments

---

[18]In addition, SIL purchased 50,000 shares of NSP's second preferred stock for $5 million ($100/share). A.R. Doc. 224 at 2385. Commerce found the publicly traded price of NSP common stock to be $7/share, "indicating that SIL received its shares at a discount." A.R. Doc. 224 at 22387.

[19]Canada and Nova Scotia purchased 100,000 and 50,000 second preferred shares of NSP for $10 million and $5 million, respectively ($100/share). A.R. Doc. 224 at 2385–86.

[20]The Toronto Dominion Bank purchased $75 million of "term difficulty preferred shares" from NSP. The proceeds from the reorganization were used primarily to retire debt. A.R. Doc. 224 at 2385–86.

were not similarly situated.[21] SIL's purchase of the second preferred shares was linked to its purchase of common stock. The second preferred shares do not provide the governments with the same benefit conferred to SIL. *See* A.R. Doc. 224 at 2386–88. For example, Canada will receive *no* cash dividend until March 31, 1990, from which time a dividend will accrue at a rate equal to one-half of the average prime rate plus three percent. A.R. Doc. 224 at 2386. Also, a one-time stock dividend of two shares of common stock was to be paid for each share of second preferred stock within five years of the issuance date. *Id.* Significant factors distinguish this action from the *Carbon Steel from Luxembourg* decision to warrant a different resolution. Therefore, Commerce's determination was based on substantial evidence, and in accordance with law.

C. *Improper Inclusion of Non-Canadian Assets:*

Commerce admits it improperly included NSP's and FPIL's non-Canadian subsidiary assets in its subsidy calculation, but suggests such error be rectified during an administrative review. If no review is conducted, however, the error will not be corrected. Therefore, the Court directs Commerce to adjust its calculations accordingly.

CONCLUSION

Commerce's determination is remanded for recalculation of the countervailable portion of the subsidy received under the Newfoundland loan program administered by the Fisheries Loan Board. Commerce shall use as its benchmark rate of interest that which is used under the RDLP.

Commerce shall also recalculate the countervailable portion of the subsidy received in the equity infusions in NSP and FPIL to account for the erroneous inclusion of non-Canadian assets.

Commerce shall file the results of the remand proceedings with the Court within 45 days. Plaintiffs will thereafter have 15 days in which to file a brief on the remand determinations with the Court. Defendant shall file a reply within 15 days after receipt of plaintiff's brief.

---

[21]Commerce was unable to derive the actual value on each portion of this transaction because an "analysis of these preferred shares purchased by the government indicates that the expected return *on them* is below that which would be required by a private investor." 51 Fed. Reg. at 10,047–48 (final) (emphasis added).