NTN BEARING CORP. OF AMERICA, American NTN Bearing Mfg. Corp.; and NTN Toyo Bearing Co., Ltd., Plaintiffs,

v.

UNITED STATES and Robert Mosbacher, Secretary of Commerce, Defendants,

The Torrington Company, Defendant–Intervenor.

Court No. 89–06–00350.

United States Court of International Trade.

Feb. 28, 1991.

Barnes, Richardson & Colburn, Robert E. Burke, Donald J. Unger, Brian F. Walsh and Kazumune V. Kano, for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Jeanne E. Davidson, of counsel: John D. McInerney, Sr. Counsel, Douglas S. Cohen, Craig R. Giesse, Diane McDevitt, Stephanie J. Mitchell and Maria Solomon, Attorney–Advisors, Office of the Chief Coun-

sel for Import Admin., Dept. of Commerce, for defendants.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., David Scott Nance, John M. Breen, Jessica A. Wasserman and Patrick J. McDonough, for defendant-intervenor.

## OPINION

TSOUCALAS, Judge:

Plaintiffs, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Toyo Bearing Company, Ltd. (collectively, "NTN"), have filed this motion for partial judgment on the agency record, to contest the final determinations of the Department of Commerce, International Trade Administration ("Commerce" or "ITA") in *Final Determinations of Sales at Less Than Fair Value; Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan,* 54 Fed.Reg. 19,101 (1989). In particular, plaintiffs challenge the ITA's finding that petitioner, The Torrington Company ("Torrington"), had standing to file an antidumping duty petition "on behalf of" the domestic industries which manufacture ball bearings, spherical roller bearings, cylindrical roller bearings, needle roller bearings and spherical plain bearings.

Plaintiffs also challenge the ITA's decision to reinitiate an investigation of NTN's costs of production, asserting that the decision came too late and denied NTN due process rights.

The Court's jurisdiction is based on 28 U.S.C. § 1581(c) (1988).

### Background

Torrington filed an antidumping duty petition on March 31, 1988, alleging that it was an interested party and that the petition was filed on behalf of the domestic bearings industry. In the petition, Torrington identified one industry and one class or kind of merchandise, to wit, all antifriction

bearings (except tapered roller bearings). On July 13, 1988, the ITA determined that antifriction bearings actually comprise five classes or kinds of merchandise, namely, ball bearings, spherical roller bearings, cylindrical roller bearings, needle roller bearings and spherical plain bearings.[1] Domestic producers of each of these classes or kinds surfaced both in support of and in opposition to the petition. In its final determinations, the ITA stated that the opponents of the petition did not represent a majority of any of the domestic industries and, since Torrington produces all five types of bearings and filed a facially sufficient petition, Torrington had standing to file an antidumping petition with respect to each type of bearing. *Final Determinations of Sales at Less than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany,* 54 Fed.Reg. 18,992, 19,005 (1989) ("Final Determinations"). NTN, a producer of all five classes or kinds of bearings, claims that Torrington's petition was not filed on behalf of the domestic industries which produce those bearings, and therefore, the ITA's determination on standing must be reversed.

### Discussion

■ A determination by the Department of Commerce will be affirmed unless that determination is not supported by substantial evidence or is otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States,* 12 CIT ——, ——, 685 F.Supp. 1252, 1255 (1988) (citations omitted).

### I. Standing

The statutory requirements for initiation by petition of an antidumping proceeding

---

**1.** The ITA's determination that antifriction bearings comprise five classes or kinds of merchandise was affirmed by this court in *The Torring-* *ton Co. v. United States,* 14 CIT ——, 745 F.Supp. 718 (1990).

are that "an interested party ... files a petition with the administering authority, on behalf of an industry which alleges the elements necessary for the imposition of the duty imposed by section 1673 of this title, and which is accompanied by information reasonably available to the petitioner supporting those allegations." 19 U.S.C. § 1673a(b)(1) (1988). There appears to be no question that Torrington is an "interested party," as defined in 19 U.S.C. § 1677(9)(C) (1988).[2] Plaintiffs contend, however, that Torrington's petition is opposed by a significant portion of the relevant domestic industries and, therefore, was not filed "on behalf of" an industry.

Industry is defined as "the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product." 19 U.S.C. § 1677(4)(A) (1988). Plaintiffs assert that this statute, read with the "on behalf of" language of section 1673a, requires petitioner to prove that its petition has the expressed endorsement of a *majority* of the domestic industry, and that in this case, the petitioner has not so shown.

■ It is a longstanding administrative practice that, when an antidumping petition is filed, the ITA assumes the petitioner has filed on behalf of the domestic industry. *Final Determinations*, 54 Fed.Reg. at 19,-004. *See also Electrical Conductor Aluminum Redraw Rod from Venezuela*, 53 Fed.Reg. 24,755, 24,756 (1988); *Fresh Atlantic Groundfish From Canada*, 51 Fed. Reg. 10,041, 10,043 (1986). Standing is only an issue if "it is affirmatively shown that this is not the case." 51 Fed.Reg. at 10,043. This presumption has been affirmed by this court. *Comeau Seafoods Ltd. v. United States*, 13 CIT ——, ——, 724 F.Supp. 1407, 1411 (1989); *Florex v. United States*, 13 CIT ——, ——, 705 F.Supp. 582, 587–88 (1989). To overcome the presumption in favor of standing, Commerce requires that a "majority of the do-

mestic industry affirmatively [demonstrate that it] opposes the petition." *Final Determinations*, 54 Fed.Reg. at 19,004. *See also Electrical Redraw Rod*, 53 Fed.Reg. at 24,756; *Frozen Concentrated Orange Juice From Brazil*, 52 Fed.Reg. 8,324, 8,325 (1987).

The legislative history of section 1673a(b)(1) supports this broad interpretation of the standing requirements. Though nowhere in the legislative history is there any indication of Congress' intent regarding the support within the domestic industry for the petition, there is general guidance on application of the standing rules. The Senate Report on the Trade Agreements Act of 1979, expressed Congress' intent that the standing criteria "be administered to provide an opportunity for relief for an adversely affected industry and to prohibit petitions filed by persons with no stake in the result of the investigation." S.Rep. No. 249, 96th Cong., 1st Sess. 63, *reprinted in* 1979 U.S.CODE CONG. & ADMIN.NEWS 381, 449.

The Report stresses that investigations ought to go forward "unless the authority is convinced that the petition and supporting information fail to state a claim upon which relief can be granted ... or the petitioner does not provide information supporting the allegations which is reasonably available to him." *Id.* Thus, Congress clearly did not intend the standing requirements to present an impediment to an antidumping investigation where an interested party had filed a facially sufficient petition and had a stake in the result of the investigation.

■ The standing requirements have been interpreted by this court several times in recent years. A two-step process for determining standing was defined in *Gilmore Steel Corp. v. United States*, 7 CIT 219, 585 F.Supp. 670 (1984). First, the petitioner must be an interested party and second, the petitioner must "show that a majority of that industry backs its petition." *Id.* at 226, 585 F.Supp. at 676.

---

**2.** An interested party under 19 U.S.C. § 1677(9)(C) is "a manufacturer, producer, or wholesaler in the United States of a like prod-

uct." NTN has made no allegation that Torrington is not a manufacturer or producer of any of the products in this case.

Both sides in this action cite *Gilmore* with approval. Where they diverge is in the interpretation of the second step in that process. Plaintiffs argue that the failure of the petitioner to prove that a majority of the domestic industry supports its petition is fatal and mandates dismissal of the case. *Plaintiffs' Brief* at 10. Defendants counter that if a majority does not support the petition, the ITA has the discretion to dismiss the case, but is not obliged to do so. *Memorandum of the United States in Opposition to Plaintiffs' Motions for Partial Judgment Upon the Agency Record Regarding Certain Fundamental Issues* ("Defendants' First Brief") at 35.

In *Citrosuco Paulista, S.A. v. United States*, 12 CIT ——, 704 F.Supp. 1075 (1988), this court rejected the contention of the plaintiff that Commerce must dismiss a petition which is not "affirmatively supported by a majority of the domestic industry." 12 CIT at ——, 704 F.Supp. at 1085. The court stated that "[n]either the statute nor Commerce's regulations require a petitioner to establish affirmatively that it has the support of a majority of a particular industry." *Id.* The court found that *Gilmore* stands "for the proposition that Commerce has discretion to dismiss, but is not required to dismiss, petitions that are not shown to be actively supported by a majority of the domestic industry." *Id.*

In *Comeau,* this court expressly disagreed with the notion that *Gilmore* held that the ITA "must dismiss petitions not proven to be affirmatively supported by a majority of the domestic industry." 13 CIT at ——, 724 F.Supp. at 1411. The court reiterated that the decision whether to dismiss on the basis of lack of support from the domestic industry is within the discretion of the ITA.

In *Florex,* the court followed its previous rulings in upholding the ITA's determination that an antidumping petition was "representative of the industry's view," even though less than half the domestic industry affirmatively supported the petition. 13 CIT at ——, 705 F.Supp. at 588. The court observed that there was no precedent which precluded the ITA from "accept[ing]

the petitioner's allegations as to its representation of industry views until industry lack of support is demonstrated." *Id.* Though the ITA certainly may revoke an antidumping order where there is little industry support for it, the ITA plainly is not required to do so.

Our appellate court addressed this issue in *Oregon Steel Mills Inc. v. United States,* 862 F.2d 1541 (Fed.Cir.1988). There the court held that the ITA had the authority to revoke an antidumping duty order where the "overwhelming" majority of the industry indicated its desire to see the order revoked. 862 F.2d at 1545. The holding, however, was limited to the affirmation of the ITA's *authority* to revoke and the court explicitly declined to address the issue of whether a petitioner must show majority support. *Id.* Furthermore, the decision is consistent with this court's previous holdings in that the vast majority of the domestic industry was not merely indifferent but positively opposed to the antidumping duty order. In keeping with this court's deferral to the discretion of the ITA on the issue of petitioner's standing, the Court of Appeals stated that "lack of industry support provides a ground for ... revocation" of an antidumping duty order. *Id.* The court pointedly did not assert that lack of majority industry support *compels* revocation.

 In light of the Act's legislative history and this court's extensive caselaw, the Court finds that the ITA's presumption that a petition is filed on behalf of an industry is a reasonable one and is consistent with the intent of the statute. When opponents of the petition surface, however, the ITA must investigate the depth of industry support for the petition. The investigation will not be rescinded unless the opponents of the petition constitute the majority of U.S. production in that industry. However, as the legislative history and caselaw discussed above indicate, even if opponents outweigh supporters of the petition, the ITA still has the discretion to continue or to dismiss the case, provided that discretion is exercised reasonably and the decision is supported by substantial

evidence. Neither the statute nor the case-law compels Commerce to dismiss a case which lacks affirmative majority support.[3] *Sandvik AB v. United States,* 13 CIT ——, ——, 721 F.Supp. 1322, 1328 (1989), *aff'd,* 904 F.2d 46 (Fed.Cir.1990).

■ In the present case, Torrington's petition is supported by at least seven other domestic bearings manufacturers.[4] The ITA found that six domestic producers, including the plaintiffs herein, oppose Torrington's petition.[5] In order to gauge the depth of this opposition to the petition, Commerce garnered information on the percentage of domestic bearings produced by the opponents in terms of both value of the merchandise and volume. 54 Fed.Reg. at 19,005. This is because neither value nor volume, standing alone, provides a reliable measure of market share, since a maker of expensive bearings may have a large market share in terms of value, but an insignificant share in terms of volume. The reverse is true for a producer of low cost bearings. *See Defendants' First Brief* at 50–51; AR (Conf.) Doc. 37. The Court finds that Commerce's use of both value and volume to determine market share was reasonable and was the best measure of market share in the bearings industry.

To calculate total United States production of ball bearings, cylindrical roller bearings and spherical roller bearings, Commerce relied on quarterly information from the Antifriction Bearing Manufacturers Association ("AFBMA") concerning total U.S.

shipments of bearings during the review period. Where AFBMA data was unavailable, the ITA used figures from the U.S. Census Bureau ("Census"). NTN argues that the AFBMA data has "no indicia of *reliability* or *objectivity." Plaintiffs' Brief* at 14 (emphasis in original).

■ Plaintiffs point to the ITA's determination in *Frozen Orange Juice,* wherein the ITA found trade association data on orange juice production "questionable." 52 Fed.Reg. at 8325. Nowhere in that determination did the ITA state that trade association data is innately unreliable. In this case, the ITA found the data to be credible and accurate and no evidence has been introduced to the contrary. Plaintiffs seem to rely on the fact that the International Trade Commission ("ITC") did not use this data. *Plaintiffs' Brief* at 15. It is the function of the *ITA* to determine standing and no statute or regulation requires the ITA to defer to data used by the ITC. 19 U.S.C. § 1673a(c) (1988). Provided congressional intent is not frustrated, inconsistencies in the agencies' determinations are to be expected. *See Sandvik,* 13 CIT at ——, 721 F.Supp. at 1328–29; *Algoma Steel Corp. v. United States,* 12 CIT ——, ——, 688 F.Supp. 639, 642 (1988), *aff'd,* 865 F.2d 240 (Fed.Cir.1989), *cert. denied,* —— U.S. ——, 109 S.Ct. 3244, 106 L.Ed.2d 590 (1989). The Court finds that the use of AFBMA data in this case was reasonable and proper.

■ That data indicates that the market share of the opponents to the petition did

---

**3.** A recent case held otherwise and currently is pending before our appellate court. *Suramericana de Aleaciones Laminadas, C.A., et. al. v. United States,* 14 CIT ——, 746 F.Supp. 139 (1990), *appeal docketed,* No. 91–1015 (Fed.Cir. Oct. 5, 1990).

**4.** Support for Torrington's petition came from PT Components, Inc., Thomson Industries, MPB Corporation, Federal Mogul Corporation, Pacamor Kubar, Lipe–Rollway Corporation and The Barden Corporation. *See* Administrative Record ("AR") (Pub.) Docs. 15, 49, 417, 427, 445, 457 and 458.

**5.** Every one of them is related to an importer of the allegedly dumped merchandise and would be adversely affected by an affirmative dumping

determination. Hence, Commerce could have excluded them as "related parties" under 19 U.S.C. § 1677(4)(B) (1988), which states that

When some producers are related to the exporters or importers, or are themselves importers of the allegedly subsidized or dumped merchandise, the term "industry" may be applied in appropriate circumstances by excluding such producers from those included in that industry.

Here, Commerce chose not to exclude related parties from its calculations of the domestic industries. In deciding not to exclude "wholly-owned U.S. subsidiaries of the foreign respondent firms," the ITA stated that its decision was based on the fact that they did not constitute a majority of the domestic industry anyway. 54 Fed.Reg. at 19,005.

not rise above 50% of the value of total U.S. production in any of the five classes or kinds. AR (Conf.) Doc. 37. In all but one of the classes or kinds, the opponents' total did not even approach 40%. *Id.* Plaintiffs assert that these totals are skewed because the ITA did not survey the entire domestic industry, but rather surveyed only those who expressed opposition to petitioner's standing. *Plaintiffs' Brief* at 13. The ITA's practice is to "determine the strength (*i.e.,* share of the domestic industry) of the opposition to the petition." *Defendants' First Brief* at 45. The Federal Register publishes notice of initiation of petitions and any domestic manufacturers who so chose could have expressed their opposition to the petition; indeed, six did. The ITA need not conduct a probe of the entire industry to determine a petitioner's standing. *See Sandvik,* 13 CIT at ——, 721 F.Supp. at 1328; *Citrosuco,* 12 CIT at ——, 704 F.Supp. at 1085.

■ The evidence supports the ITA's determination that the petition was filed on behalf of the relevant domestic industries. That is, the supporters of the petition constitute a "major proportion" of the relevant industries. In this regard, the Court notes that a major proportion need not be a majority, particularly in a highly competitive industry such as the bearings industry. Consequently, the Court holds that the ITA's determination that Torrington possessed standing to initiate the investigation on behalf of the relevant domestic industries was within the ITA's discretion according to law and was supported by substantial evidence.

## II. Cost of Production

The Tariff Act of 1930, as amended, 19 U.S.C. § 1677b(b) (1988) provides that, if the ITA "has reasonable grounds to believe or suspect that sales in the home market of the country of exportation ... have been made at prices which represent less than the cost of producing the merchandise ...,such sales shall be disregarded in the determination of foreign market value." A cost of production investigation may be initiated by the ITA if the petitioner files its request in a timely manner and the information supporting the request meets statutory and judicial standards. 19 U.S.C. § 1677b(b); *Floral Trade Council of Davis, Cal. v. United States,* 12 CIT ——, ——, 698 F.Supp. 925, 926 (1988); *Al Tech Specialty Steel Corp. v. United States,* 6 CIT 245, 247–48, 575 F.Supp. 1277, 1280–81 (1983), *aff'd,* 745 F.2d 632 (Fed.Cir.1984). Plaintiffs claim that Commerce denied NTN its right to due process by initiating a cost of production ("COP") investigation too late in the proceedings, depriving NTN of the opportunity to comment on the ITA's methodology. *Plaintiffs' Brief* at 19.

In its petition of March 31, Torrington alleged that plaintiffs were selling antifriction bearings in their home market at prices below the cost of production. AR (Pub.) Doc. 1 at 100–02. The ITA initiated an investigation as to plaintiffs, who objected on the basis of the fact that Torrington's allegations relied on country-wide data, rather than the company-specific information required by the court in *Al Tech.* On July 22, Commerce asked Torrington to supplement its submissions. AR (Pub.) Doc. 120.

When Torrington's supplements still did not satisfy the statutory and *Al Tech* standards, Commerce rescinded the COP investigations in each of the five classes or kinds of bearings. *See* AR (Pub.) Doc. 160. However, Commerce provided Torrington with an opportunity to submit revised cost allegations which would satisfy the statutory and judicial standards. *Id.* at 5; AR (Pub.) Doc. 164 at 3. Petitioner did so within the ITA's stated deadline, and Commerce then reinstituted the COP investigations covering NTN's ball bearings, spherical roller bearings, cylindrical roller bearings and needle roller bearings. AR (Pub.) Docs. 180, 309, 329; *Preliminary Determinations of Sales at Less Than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan,* 53 Fed.Reg. 45,343, 45,345 (1988). Commerce did not reinstitute the COP investigation as to NTN's spherical plain bearings. NTN contends that this reinitiation of the investigation prejudiced its rights because it came too late and did

not allow time for the ITA to use NTN's cost data in the preliminary determination.

Torrington's COP allegations were made in its petition of March 31, 1988; NTN was aware of this, as it protested the allegations from the start. Although Commerce found the allegations were incomplete and rescinded the investigations, Torrington was given time to submit revised, sufficient allegations. AR (Pub.) Doc. 164. The Court finds that Commerce's decision to permit Torrington to submit revised COP data was well within its discretion to conduct an antidumping investigation, and it did not prejudice NTN's rights.

Torrington's amended data was submitted within the time limit set by Commerce in its letter to Torrington's counsel on August 22. AR (Pub.) Doc. 164. The revised submissions were made between September 26 and October 7. AR (Pub.) Doc. 225, 252, 257. The Court finds that this extension did not constitute an unwarranted and prejudicial delay in the proceedings. The revised data was submitted prior to the issuance of the preliminary determination on October 27, and NTN had ample opportunities to comment on that data. Indeed, as discussed below, NTN submitted substantial information regarding costs subsequent to the preliminary determination, and prior to the release of the final determination on May 3, 1989.

■ NTN asserts it was prejudiced by the fact that it was not notified of the ITA's intent to reinitiate the COP investigation until three days before the preliminary determination was issued. *Plaintiffs' Brief* at 21; *see* AR (Pub.) Doc. 309. Hence, the preliminary determination did not include NTN's COP data. From this plaintiffs conclude that they were "denied the right to present their arguments" regarding this issue. *Plaintiffs' Brief* at 23. Since statute requires that the ITA publish a preliminary determination and the parties be given a right to a hearing before the final determination is published, NTN contends that the decision to reinitiate the COP investigation should be reversed. *Id.* at 24.

Section 774 of the Tariff Act of 1930, which was added to the act by the Trade Agreements Act of 1979, requires that, in antidumping duty investigations, the ITA shall "hold a hearing in the course of an investigation upon the request of any party to the investigation before making a final determination." 19 U.S.C. § 1677c(a)(1) (1988). The legislative history of that section makes clear that this requirement is "designed to permit full presentation of information and views" and to provide "that parties be given every possible opportunity to respond to information submitted by other parties." S.Rep. No. 249, 96th Cong., 1st Sess. 97, *reprinted in* 1979 U.S. CODE CONG. & ADMIN.NEWS 381, 483. Notice of any such hearing must be published in the Federal Register prior to the hearing, and a transcript of the hearing shall be made available to the public. *Id.*

The statute is explicit that the hearing must be conducted prior to the final, not the preliminary, determination. That the ITA did not notify NTN of the decision to recommence the COP investigation until three days before the preliminary determination was issued does not, in itself, mean that NTN was denied due process rights. If, prior to the issuance of the *final* determination, NTN was given an opportunity to express fully its views on reinitiation of the COP probe and to respond to the information submitted by the other parties, then the requirements of section 1677c(a)(1) have been met.

Following the reinitiation of the COP investigations regarding NTN, as well as the other respondents, the ITA "conducted hearings throughout the month of February 1989." *Defendant's Second Memorandum in Opposition to Plaintiffs' Motions for Partial Judgment Upon the Agency Record Regarding Certain Fundamental Issues* ("Defendants' Second Brief") at 36. The hearing regarding antifriction bearings from Japan was held on February 21, 1989. *See* Transcript of Hearing (Feb. 21, 1989), AR (Pub.) Doc. 438. Counsel for NTN, Torrington and other interested parties attended and participated in this hearing and submitted pre- and post-hearing briefs which addressed

the issue of reinstitution of the COP investigations. AR (Pub.) Docs. 396, 430, 438, 478, 480. The record also indicates that NTN's counsel received a copy of Torrington's pre-hearing brief and was able to and did respond to Torrington's arguments at the hearing. There is also evidence of numerous correspondences and conversations between NTN's counsel and Commerce Department officials. On May 3, 1989, Commerce issued its final affirmative determinations in this matter, wherein the ITA found LTFV sales of plaintiffs' bearings in the United States. 54 Fed.Reg. 18,992, *et. seq.*

Plaintiffs' active participation in the hearing and submission of briefs on the issue of COP, as well as their repeated correspondence with the ITA on this issue, belie their claim that they were denied due process rights or that somehow they did not have an opportunity to explain fully their position on reinitiation of the COP investigations prior to the final determination. This court has held that, where a party actively communicated with Commerce, received and submitted data, participated in public hearings and filed briefs on its behalf, no due process violations occurred. *Timken Co. v. United States*, 12 CIT ——, ——, 699 F.Supp. 300, 309 (1988), *aff'd on other grounds*, 894 F.2d 385 (Fed. Cir.1990); *NAR, S.p.A. v. United States*, 13 CIT ——, ——, 707 F.Supp. 553, 561 (1989). In this case, NTN did all of the above. Hence, the ITA's decision to reinstitute the COP investigation in this case is affirmed and plaintiffs' motion for remand is denied.

### Conclusion

The Court finds that the ITA's determination that Torrington had standing to file an antidumping duty petition regarding all five classes or kinds of antifriction bearings is supported by substantial evidence in the administrative record and is otherwise in accordance with the law. Furthermore, the ITA's decision to reinstitute the cost of production investigation regarding plaintiffs' bearings was within its statutory discretion and is affirmed. Accordingly, plaintiffs' motion for partial judgment on the agency record is denied.

### JUDGMENT

This case having been duly submitted for decision following plaintiffs' motion for partial judgment upon the agency record, and the Court, after due deliberation, having rendered a decision herein; now then, in accordance with said decision,

IT IS HEREBY ORDERED that plaintiffs' motion for partial judgment upon the agency record is denied, and it is further

ORDERED that the determination of the Department of Commerce, International Trade Administration, as to Counts 1 and 3 of plaintiffs' Complaint is affirmed, and it is further

ORDERED that pursuant to Rule 54(b) of the Rules of this Court, this is a final judgment as to Counts 1 and 3 of plaintiffs' Complaint and there is no just reason for delay in the entry of a final judgment.