**SKF USA, INC.; AB SKF; SKF GmbH and SKF Gleitlager GmbH; SKF France and Sarma; RIV–SKF Industries, S.p.A.; SKF Sverige, AB; and SKF (U.K.) Limited, Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF COMMERCE and Robert A. Mosbacher, Secretary, U.S. Department of Commerce, Defendants,**

**The Torrington Company, Defendant–Intervenor.**

**Court No. 89–06–00330.**

United States Court of International Trade.

April 8, 1991.

Howrey & Simon, Herbert C. Shelley and Lauren D. Frank, Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Jeanne E. Davidson, John D. McInerney, Sr. Counsel, Douglas S. Cohen, Craig R. Giesse, Diane McDevitt, Stephanie J. Mitchell and Maria Solomon, Attorney–Advisors, Office of the Chief Counsel for Import Admin., Dept. of Commerce, of counsel, for defendants.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., David Scott Nance and Geert De Prest, Washington, D.C., for defendant-intervenor.

## OPINION

TSOUCALAS, Judge:

Plaintiffs, SKF USA, Inc., AB SKF, SKF GmbH and SKF Gleitlager GmbH, SKF France and Sarma, RIV–SKF Industries, S.p.A., SKF Sverige AB and SKF (U.K.) Limited, (collectively "SKF") have filed this motion pursuant to Rule 56.1 of the rules

of this Court for partial judgment on the agency record, to contest certain aspects of the final determinations of the Department of Commerce, International Trade Administration ("Commerce" or "ITA") in *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany* ("Final Determinations"), 54 Fed.Reg. 18,992, *et seq.* (1989).

In particular, plaintiffs challenge the determination that petitioner, The Torrington Company ("Torrington"), had standing to bring an antidumping duty case "on behalf of" the domestic industries which manufacture cylindrical roller bearings and spherical plain bearings. Plaintiffs also assert that the wheel hub units and aircraft components they manufacture were improperly included in the scope of the investigation and should not be subject to antidumping duties. Plaintiffs also contest the ITA's decision to calculate foreign market value in Sweden and Italy using third country sales data and, ultimately, best information available.

The Court's jurisdiction is based on 28 U.S.C. § 1581(c) (1988).

## Background

The facts of this case were set out in detail in *NTN Bearing Corp. of America v. United States*, 15 CIT ——, 757 F.Supp. 1425, (Feb. 28, 1991). Briefly, the ITA, in its final determinations, found that petitioner had standing to bring an antidumping petition regarding each class or kind of bearing involved in this case, to wit, ball bearings, spherical roller bearings, cylindrical roller bearings, needle roller bearings and spherical plain bearings. *Final Determinations*, 54 Fed.Reg. at 19,006. SKF contests the initiation of the investigation into cylindrical roller bearings and spherical plain bearings. The ITA also determined that wheel hub units and aircraft bearings manufactured by SKF were within the scope of the investigations. Further, the ITA decided not to use home market sales in its calculation of foreign market value, and instead used third country sales and ultimately, best information available.

## Discussion

A determination by the Department of Commerce will be affirmed unless that determination is not supported by substantial evidence or is otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States*, 12 CIT ——, ——, 685 F.Supp. 1252, 1255 (1988) (citations omitted). Under this standard, Commerce is granted considerable deference "in both its interpretation of its statutory mandate and the methods it employs in administering the antidumping law." *Chemical Products Corp. v. United States*, 10 CIT 626, 628, 645 F.Supp. 289, 291 (1986) (citations omitted).

## I. Standing

▇ The statutory requirements for initiation by petition of an antidumping proceeding are that an interested party file a "petition with the administering authority, on behalf of an industry, which alleges the elements necessary for the imposition of the duty imposed by section 1673 of this title, and which is accompanied by information reasonably available to the petitioner supporting those allegations." 19 U.S.C. § 1673a(b)(1) (1988). SKF avers that Torrington's petition was not filed "on behalf of" the domestic cylindrical roller bearings and spherical plain bearings industries, and should have been dismissed. *Memorandum in Support of Plaintiffs' Motion For Partial Judgment Upon an Agency Record* ("Plaintiffs' Memorandum") at 14.

The Tariff Act of 1930 defines industry as "the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes *a major proportion* of the total domestic production of that product." 19 U.S.C. § 1677(4)(A) (1988) (emphasis added). Plaintiffs assert that this definition, combined with the "on behalf of" language of 19 U.S.C. § 1673a, requires petitioner to

prove that its petition has the express endorsement of a majority of the domestic industry, and that in this case, the petitioner did not so prove.

Upon the filing of an antidumping petition, Commerce presumes that the petition is filed on behalf of the relevant domestic industry. The Court in *NTN Bearing* found that this presumption is reasonable and is consistent with the intent of the statute. 15 CIT at ——, 757 F.Supp. at 1429; *see also Comeau Seafoods, Ltd. v. United States*, 13 CIT ——, ——, 724 F.Supp. 1407, 1411 (1989); *Florex v. United States*, 13 CIT ——, ——, 705 F.Supp. 582, 587–88 (1989). When opponents of the petition surface, however, the presumption is cast aside and the ITA investigates the depth of the opposition to the petition.[1] If supporters of the petition constitute a major proportion of the industry, the investigation must proceed. If not, then the ITA has the discretion to continue or to dismiss the case. *NTN Bearing*, 15 CIT at ——, 757 F.Supp. at 1429–30; *Comeau*, 13 CIT at ——, 724 F.Supp. at 1411; *Florex*, 13 CIT at ——, 705 F.Supp. at 588; *Citrosuco Paulista*, 12 CIT at ——, 704 F.Supp. at 1085.

However, in deciding whether to continue or to dismiss an antidumping proceeding, the ITA must exercise its discretion "reasonably and the decision [must be] supported by substantial evidence." *NTN Bearing*, 15 CIT at ——, 757 F.Supp. at 1429–30. *See* 19 U.S.C. § 1516a(b)(1)(B) (1988). SKF contends that Commerce's determination was not supported by substantial evidence. In particular, SKF states that the ITA improperly relied on production figures from the Antifriction Bearing Manufacturers Association ("AFBMA") in calculating production levels in the cylindrical roller bearings industry. Plaintiffs argue that the AFBMA is a trade association which is not a reliable source of this data.

The Court finds this argument wholly without merit since SKF itself relied on AFBMA data in determining its percentage of production for purposes of responding to Commerce's standing questionnaire on November 2, 1988. *See* Administrative Record ("AR") (Conf.) Doc. 14 at 6–7.

Furthermore, SKF alleges that AFBMA data is unreliable because it is trade association data based on the same type of estimates which were rejected by the ITA in *Frozen Concentrated Orange Juice From Brazil*, 52 Fed.Reg. 8,324 (1987). In *Frozen Concentrated Orange Juice*, the rejected data was based on a "succession of steps of estimations, rather than calculations," and there was contradictory information submitted by interested parties as to whether or not they supported the petition. *Id.* at 8,325. No such situation exists here. The ITA, which found the orange juice data "questionable," found the bearings industry's trade association data reliable. 54 Fed.Reg. at 19,005. Plaintiffs' use of the same data in its questionnaire response only adds to that data's credibility. The Court sees no reason to upset this finding.

SKF also challenges the ITA's decision to use U.S. Census data to calculate production levels in the spherical plain bearings industry because that data was from 1987 and the period of review in this case was October 1987 to March 1988. *Plaintiffs' Memorandum* at 23. None of the domestic producers of spherical plain bearings provided any information regarding total U.S. production of that class or kind of bearing. Hence, there was no basis for the ITA to reverse its presumption in favor of petitioner's standing and the decision to press on with the spherical plain bearings investigation was correct.

Six domestic producers expressed their opposition to petitioner's standing general-

---

**1.** To gauge the strength of the opposition to the petition, the ITA sent out questionnaires to those who opposed the petitioner's standing. Plaintiffs argue that the ITA should have probed the entire industry. This court held in *NTN Bearing* that the "ITA need not conduct a probe of the entire industry to determine a petitioner's standing." *NTN Bearing*, 15 CIT at ——, 757 F.Supp. at 1431. *See also Sandvik AB v. United States*, 13 CIT ——, ——, 721 F.Supp. 1322, 1328 (1989), *aff'd*, 904 F.2d 46 (Fed.Cir.1990); *Citrosuco Paulista, S.A. v. United States*, 12 CIT ——, ——, 704 F.Supp. 1075, 1085 (1988).

ly.[2] However, the ITA concluded that the opponents' production did not constitute a majority of the value of production in either the cylindrical roller bearings industry or the spherical plain bearings industry, and thus decided to proceed with the investigation. 54 Fed.Reg. at 19,005. The evidence in the record supports this conclusion. AR (Conf.) Doc. 37.

Accordingly, the Court holds that Commerce's determination that Torrington possessed standing to initiate an antidumping investigation on behalf of the cylindrical roller bearings and spherical plain bearings industries was supported by substantial evidence and was otherwise in accordance with law.

## II. Scope of Investigations

SKF also challenges Commerce's decision to include wheel hub units and aircraft bearings within the scope of the investigations.[3] Plaintiffs claim that the characteristics, functions and uses of these products differ from those of antifriction bearings ("AFBs"), and thus hub units and aircraft bearings should have been excluded from these investigations. *Plaintiffs' Memorandum* at 38.

This court has recognized that Commerce retains broad discretion to define the scope of an antidumping investigation. *Mitsubishi Elec. Corp. v. United States*, 12 CIT ——, ——, 700 F.Supp. 538, 552 (1988), *aff'd*, 898 F.2d 1577 (Fed.Cir.1990); *see also Smith–Corona Group v. United States*, 713 F.2d 1568, 1582 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984); *NTN Bearing Corp. of America v. United States*, 14 CIT ——, ——, 747 F.Supp. 726, 731 (1990). That discretion must be exercised reasonably

and any consequent determination must be supported by substantial evidence in the administrative record. *American Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed.Cir.1986); *Gold Star Co. v. United States*, 12 CIT ——, ——, 692 F.Supp. 1382, 1383 (1988), *aff'd sub nom., Samsung Elec. Co. v. United States*, 873 F.2d 1427 (Fed.Cir.1989).

### A. Wheel Hub Units

When a question arises as to whether a particular product is within the scope of an investigation, the ITA first must determine whether the petition covers that product. If the petition is ambiguous, Commerce then examines additional documentary evidence. If the scope is still unclear, Commerce looks to other criteria, including the factors enumerated in *Diversified Products Corp. v. United States*, 6 CIT 155, 162, 572 F.Supp. 883, 889 (1983).[4] *See Memorandum of the United States in Opposition to Plaintiffs' Motions for Partial Judgment Upon the Agency Record Regarding Certain Fundamental Issues* ("Defendants' Memorandum") at 62–64.

The pertinent Commerce regulation effective at the time Torrington filed its petition stated that the petition must contain a "detailed description of the imported merchandise in question, including its technical characteristics and uses, and, where appropriate, its tariff classification under the Tariff Schedules of the United States." 19 C.F.R. § 353.36(a)(4) (1987).[5] The petition described the merchandise in question as

all ground antifriction bearings and all parts thereof both finished and unfinished with the exception of tapered roller bearings. (Footnote omitted). Included

**2.** The ITA found that the petition had the support of at least seven other domestic bearings producers. AR (Pub.) Docs. 15, 49, 417, 427, 445, 457 and 458.

**3.** According to plaintiffs, there have been three generations of automotive hub units. Plaintiffs have not challenged the ITA's inclusion of generation 1 within the scope, but claim that generations 2 and 3 are "completely distinguishable from antifriction bearings." *Plaintiffs' Memorandum* at 38.

**4.** These include the general physical characteristics of the merchandise, the expectations of the ultimate purchasers, channels of trade in which the goods travel, the ultimate use of the product, and its cost. *Id.*

**5.** A revised version of this regulation is now found at 19 C.F.R. § 353.12(b)(4) (1990).

within the scope of this petition are ball bearings, cylindrical roller bearings, spherical roller bearings, spherical plain bearings, needle roller bearings, thrust bearings, tappet bearings, and all mounted bearings such as set screw housed units, bushings, pillow block units, flange, cartridge and take-up units and parts including balls, rollers, cages or retainers, cups, shields and seals.

AR (Pub.) Doc. 1 at 13. The bearings were described in more detail under separate headings, including "Housed Bearing Units." *Id.* at 19. Within this heading, wheel hub units were specifically listed, with an explanation that the "bearing configuration may be ball, roller, or otherwise." *Id.*

On May 24, 1988, the ITA expressly requested Torrington's counsel to indicate whether the petitioner wanted generations 1, 2 and 3 of hub units included in the scope and also whether it produces them. AR (Pub.) Doc. 59. In response, Torrington stated that

the petition was intended to cover *all* antifriction bearings ... and parts, including so-called application bearings and bearing units (e.g., bearings which incorporate some additional feature to permit ease of assembly, mounting, etc.). Thus, ... wheel hub units (regardless of generation (i.e., I, II, III or some other nomenclature)) are all plainly included within the intended scope of the petition, regardless of the TSUS classification.

AR (Pub.) Doc. 49 at 5 (emphasis in original). Torrington also explained that it does not produce generation 1 wheel hubs for automotive use, but it does produce a similar product, to wit, a double-row bearing with a common race. Torrington does produce wheel hub units for other applications, such as machine tools and aircraft. *Id.* at 7.

Moreover, in an intra-office memorandum dated June 13, 1988, ITA analysts asserted that, while the issue of the scope of the investigations continued to confuse the parties as to certain products, there was no confusion surrounding wheel hub units. AR (Pub.) Doc. 72 at 1–2. Unlike other automotive parts, wheel hub units were clearly within the scope, and "were specifically named in the petition." *Id.* at 2. Hence, it is evident that the intent of the petitioner was to include wheel hub units, regardless of generation, within the scope of the petition. Plaintiffs profess that, notwithstanding the intent of the petitioner, wheel hub units are so different from antifriction bearings that Commerce should not have included them in the scope.

SKF relies heavily on the *Diversified Products* criteria to support its contention that wheel hub units are not within the scope of the investigations. *Plaintiffs' Memorandum* at 36–42. The *Diversified Products* criteria are mandated for scope determinations only where the product in question is a newly developed one which was not in existence at the outset of the investigations. The ITA is not obliged to apply the *Diversified Products* criteria to a preexisting product. *American NTN Bearing Mfg. Corp. v. United States*, 14 CIT ——, 739 F.Supp. 1555, 1565 (1990). As it is not contested that wheel hub units were in existence at the outset of the investigations, the ITA's decision to rely on other factors, in particular the express language of the petition, was correct.

In the Final Determinations, Commerce stated that its scope determinations were based upon "comments from the petitioner and interested parties, our research memoranda and analyses undertaken in connection with these investigations, as well as on the ITC preliminary determination, questionnaire, and staff report." 54 Fed.Reg. at 19,007. Relying on this evidence, Commerce found that wheel hub units, even generations 2 and 3, are "simply bearings modified in ways similar to otherwise enhanced parts containing raceways. While wheel hub units may have features which allow them to serve additional functions such as facilitating mounting, they retain their essential bearing function." *Id.* at 19,014. Thus, they were included in the scope and, like the other classes of antifriction bearings, were categorized according to the type of rolling element they contain. *See The Torrington Co. v. United States*, 14 CIT ——, 745 F.Supp. 718 (1990).

Since the petition specifically named wheel hub units and additional documentary evidence supports the conclusion that they are within the scope, the Court need not inquire further. Accordingly, the Court holds that the ITA's determination that wheel hub units are within the scope of the investigation is supported by substantial evidence and is otherwise in accordance with law.

### B. *Aircraft Bearings*

■ SKF also asserts that aircraft components are a separate class or kind of merchandise not properly included within the scope. *Plaintiffs' Memorandum* at 43. Much of the dispute as to aircraft bearings seems to stem from a tussle over terminology. Plaintiffs repeatedly refer to the merchandise in question as "aircraft components," while the Final Determinations refer to "AFBs (including rod ends and other spherical plain bearings) used in aviation applications." 54 Fed.Reg. at 19,-010. The term "aircraft *components*" is a general term which may encompass any element of an aircraft, while the merchandise which was part of this investigation was aircraft *bearings.*

This distinction was recognized by the ITA when it excluded from the investigations "airframe components that are unrelated to the reduction of friction." *Id.* However, aircraft *bearings* are within the scope of these investigations. SKF would have all AFBs used in aviation applications excluded from the scope of the investigations because, *inter alia,* they are of a "superior quality than any of the five classes or kinds of standard commercial bearings." *Plaintiffs' Memorandum* at 43.

Such an exclusion would have been in clear contravention of the express intent of the petition, which specifically stated that bearings used in "aircraft engines" and

"aviation and aerospace" applications were covered by the petition. AR (Pub.) Doc. 1 at 14, 17, and Exhibit 4. Moreover, in its response to the ITA's scope clarification request, the petitioner explained that SKF's airframe components "are likely to be aircraft rod end bearings ... a product of importance to Torrington." AR (Pub.) Doc. 49 at 6–7, and Exhibit 2. Similarly, the ITA's June 13, 1988, memorandum indicated that "[r]od ends and rod end bearings, which some parties have referred to as aircraft components," were subject to the investigations. AR (Pub.) Doc. 72 at 3.

As they did with wheel hub units, plaintiffs have attempted to segregate aircraft bearings from these investigations by using a *Diversified Products* analysis to prove that they are "more than bearings." *Plaintiffs' Memorandum* at 44; *see also* AR (Pub.) Doc. 65 at 4–8. For the reasons enumerated above, the Court need not conduct a *Diversified Products* analysis where the petition is unambiguous and additional documentary evidence supports the ITA's determination. Such is the case with aircraft bearings; they were expressly included in the petition, and later support for their inclusion was provided by petitioner to the satisfaction of the ITA.

Accordingly, the Court finds that bearings manufactured by SKF for aircraft applications were properly included in the scope of these investigations, and that aircraft components not related to the reduction of friction were properly excluded.

### III. Home Market Viability

■ Finally, SKF contests the decision by the ITA to use third country data to determine the foreign market value of SKF's ball bearings from Italy and Sweden, and spherical roller bearings from Sweden.[6] 54 Fed.Reg. at 19,033, 19,099, 19,115.

---

**6.** Defendant-intervenor argues that SKF failed to exhaust its administrative remedies by not contesting this issue before the ITA prior to the Final Determinations. *Defendant Intervenor's Response to Plaintiffs' Motion For Partial Judgment on the Record* at 59. However, since other parties brought the issue to Commerce's atten-

tion during the investigations, and Commerce itself decided to recalculate home market viability as to SKF, defendant-intervenor's point is moot. Furthermore, the ITA did not reveal the results of the recalculation until the Final Determinations, hence SKF did not have an opportunity to contest it at the time.

In the course of an antidumping investigation, Commerce must determine if the imported merchandise was sold in the United States at less than fair value. 19 U.S.C. § 1673d(a)(1) (1988). In doing this, the ITA compares the United States price of the goods to their foreign market value ("FMV"), and the amount by which FMV exceeds the U.S. price is the dumping margin. 19 U.S.C. § 1673e(a)(1) (1988). Determining FMV requires that the ITA choose which foreign market sales to use for comparison pursuant to a statutory and regulatory hierarchy. *U.H.F.C. Co. v. United States*, 916 F.2d 689, 692 (Fed.Cir.1990).

Ideally, FMV is the price "at which such or similar merchandise is sold ... in the principal markets of the country from which exported," that is, the home market of the firm. 19 U.S.C. § 1677b(a)(1)(A) (1988). However, if the ITA determines that the merchandise is not sold in the home market, or if

> the quantity sold for home consumption is so small in relation to the quantity sold for exportation to countries other than the United States as to form an inadequate basis for comparison, then the price at which [such or similar merchandise is] so sold or offered for sale for exportation to countries other than the United States,

shall be the foreign market value. 19 U.S.C. § 1677b(a)(1)(B) (1988). In certain cases, even such "third country sales" may be an inappropriate basis for determining FMV, in which case the ITA may use "constructed value." 19 U.S.C. § 1677b(a)(2) (1988); 19 C.F.R. § 353.48(b) (1990); *see Kerr–McGee Chemical Corp. v. United States*, 14 CIT ——, ——, 741 F.Supp. 947, 950 (1990).

The statute and the ITA's own regulations state that home market sales will be used unless such sales are so small as to constitute an inadequate basis for comparison to U.S. sales. 19 U.S.C. § 1677b(a)(1)(B); 19 C.F.R. § 353.4 (1987).[7] Generally, home market sales are considered too small if they constitute less than five percent of the quantity sold in countries other than the United States. *Id.* In that case, since the home market is not "viable," FMV must be calculated by alternative means, that is, by using either third country sales or constructed value. 19 U.S.C. § 1677b(a)(2) (1988). Plaintiffs' complaint is that the ITA erred in its viability calculations for the Swedish and Italian home markets for ball bearings and for the Swedish home market for spherical roller bearings. *Plaintiffs' Memorandum* at 29.[8]

 The first step in calculating foreign market value is determining whether the home market is viable, and thus whether it is the proper basis for comparison to the U.S. market. The ITA decided to conduct viability tests for each of the five classes or kinds of bearings under investigation, rather than, as is more common, for all of the such or similar merchandise categories. 54 Fed.Reg. at 19,020–021. This was because the variations in characteristics of the such or similar merchandise selected by Commerce would have made it "necessary to conduct several hundred viability tests." *Defendants' Memorandum* at 135. Given the statutory time constraints involved in an antidumping investigation and the unique complexity of the bearings investigations, this method of testing viability was reasonable and in accordance with law.

 For ball bearings from Sweden and Italy, the ITA had to determine whether ball bearings were sold in Sweden and Italy and, if so, whether such sales were sufficient to form an adequate basis for comparison. The ITA found that SKF did sell ball

---

7. Now found in 19 C.F.R. § 353.48 (1990).

8. The International Trade Commission ("ITC") found that sales of spherical roller bearings from Sweden were not materially injuring or threatening material injury to, or retarding the establishment of, a U.S. industry. *Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Parts Thereof From Sweden*, 54 Fed.Reg. 20,907–908 (1989). Hence, spherical roller bearings from Sweden were not subject to any antidumping duty order and the determinations as to them cannot be challenged by SKF. *See Rose Bearings Ltd. v. United States*, 15 CIT ——, 751 F.Supp. 1545 (1990).

bearings in Sweden and Italy. However, Commerce found that SKF's sales of ball bearings and parts thereof in each country constituted less than 5% of SKF's total non-U.S. sales, rendering the Swedish and Italian home markets not viable. 54 Fed. Reg. at 19,022.

SKF contends that the inclusion of parts in the viability calculations distorted the results. This is because SKF sells only finished bearings in Sweden and Italy, but sells both finished bearings and parts of bearings (*e.g.*, balls and rollers) to third countries. Thus, dividing finished bearings alone by finished bearings and parts yielded a figure of less than 5%.

This problem was brought to Commerce's attention during the investigations and, to "address possible problems of skewed results arising from the inclusion of parts, [the ITA] ... performed the viability test again, excluding parts." *Id.* The outcome of the test was that there was "a substantial increase in the ratio of home market to third country sales, indicating that the inclusion of parts had skewed the results of the viability test." *Id.* This new ratio, however, was not disclosed by the ITA. In fact, the ITA failed to state whether the home markets for ball bearings were viable at all.[9] Instead, Commerce moved on to a third test, comparing home market sales to third country sales. The one with the most identical matches to products sold in the U.S., in this case the third country, was the one chosen for FMV calculations. *Id.*

The Court can see no reasonable justification for this additional test. Given that the inclusion of parts skewed the first viability test's results, the second test, comparing only finished bearings, should have been sufficient. If SKF's home market sales of finished bearings were greater than 5% of its non-U.S. sales, and if there was no good reason to bypass the 5% rule, the home market should have been deemed

viable, and then used to calculate FMV. While the Court recognizes that the 5% rule is merely a guideline and not a hard and fast rule, it remains one of Commerce's regulations and the ITA is required to explain its decision not to use it in its viability determinations. This was not done in this instance.

▮ Additionally, as home market sales are the statutorily preferred choice for comparison in FMV calculations, the ITA cannot use third country sales without first making a definitive determination that the home market is not viable. *See U.H.F.C.*, 916 F.2d at 698. Nowhere in the Final Determinations does Commerce state that the Swedish and Italian home markets for finished ball bearings were not viable.

▮ While the ITA is granted broad discretion in conducting anti-dumping investigations, that discretion is not without limit; its determinations must be supported by substantial evidence in the record and must be in accordance with law. The fact that third country markets had more identical matches than the home markets does not constitute substantial evidence to support a decision not to use home market sales data, where that data is preferred by statute. *See also* S.Rep. No. 249, 96th Cong., 1st Sess. 94–96, *reprinted in* 1979 U.S.Code Cong. and Admin.News 381, 480–82.

Accordingly, the Court remands to the ITA the issue of foreign market value, with instructions to make a definitive determination as to whether or not the home markets for finished ball bearings from Sweden and Italy were viable. If they were viable, the ITA is instructed to recalculate FMV using home market sales data, and consequently, to recalculate the dumping margin in accordance with that data. If they were not viable, then the ITA's decision to use third country data and ultimately best information available, shall stand.[10]

---

9. In contrast, the ITA did state that the home market for SKF–Sweden's spherical roller bearings was not viable, regardless of whether parts were included in the calculations. 54 Fed.Reg. at 19,022.

10. The ITA found "numerous discrepancies, errors in methodology and mathematical errors" regarding the third country data submitted by SKF–Sweden and SKF–Italy, and therefore opted to use best information available instead of SKF's third country data in determining FMV.

*Conclusion*

The Court holds that the ITA properly concluded that petitioner, The Torrington Company, had standing to file an antidumping petition on behalf of the relevant domestic industries. Furthermore, the ITA correctly included wheel hub units and aircraft bearings in the scope of the investigations. However, on the issue of foreign market value, the Court finds that Commerce's decision to use third country data instead of home market data in its FMV calculations was not in accordance with law, and the issue is remanded to the ITA for further proceedings consistent with this opinion.

## JUDGMENT

This case having been duly submitted for decision following plaintiffs' motion pursuant to Rule 56.1 of the Rules of this Court for partial judgment upon the agency record, and the Court, after due deliberation, having rendered a decision herein; now then, in accordance with said decision,

IT IS HEREBY ORDERED that the determination of the Department of Commerce, International Trade Administration ("ITA"), as to Counts 1, 4, 5, 6 and 8 of plaintiffs' Complaint is affirmed, and it is further

ORDERED that the determination of the ITA as to Counts 2 and 9 of plaintiffs' Complaint is remanded to the agency for further proceedings consistent with the attached opinion.

---

54 Fed.Reg. at 19,034. Since the Court finds that the determination not to use home market data was not in accordance with law, the Court does not pass judgment on whether the decision to use best information available was correct.