**INTREPID, Plaintiff,**

v.

**Mamie E. POLLOCK, District Director of Customs, and United States of America, Defendants.**

**Court No. 88–04–00279.**

United States Court of
International Trade.

July 26, 1991.

Holland & Knight, David H. Baker, Dickson R. Loos and Mitchell H. Stabbe, Washington, D.C., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Velta A. Melnbrencis (Tanya J. Potter, Attorney–Advisor, Office of Chief Counsel for Import Admin., U.S. Dept. of

Commerce), Washington, D.C., for defendants.

## OPINION

TSOUCALAS, Judge:

This case comes before the Court on remand from the United States Court of Appeals for the Federal Circuit. *Intrepid v. Pollock,* 907 F.2d 1125 (Fed.Cir.1990). Plaintiff seeks review of the determination by the Department of Commerce, International Trade Administration ("Commerce" or "ITA"), that its merchandise, British Standard ("BS") pipe, is within the scope of the antidumping duty order regarding certain welded steel pipes from Thailand. *See Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes From Thailand* ("Order"), 51 Fed.Reg. 8,341 (1986).

### Background

Commerce published the antidumping duty order on March 11, 1986. *Id.* On February 24, 1988, Intrepid wrote Commerce requesting that the ITA determine whether the pipe Intrepid imported from Thailand, known as BS 1387/67, was subject to the Order. Administrative Record ("AR") Doc. 1. In its letter, Intrepid suggested that it was not, since the investigation concerned A-120, or standard pipe and structural tubing, whereas the BS pipe was a water pipe which was not manufactured in this country, and in fact rarely was used in the continental United States. *Id.*

Commerce notified interested parties of Intrepid's request and solicited comments from them. AR Doc. 2. The petitioners, Individual Producer Members of the Subcommittees on Standard and Line Pipe of the Committee on Pipe and Tube Imports, asserted that Intrepid's pipe was within the scope because the petition as well as the preliminary and final determinations covered the product. On January 19, 1989, Commerce advised plaintiff that Intrepid's pipes

were within the scope of the Order. AR Doc. 9.

Plaintiff now contends that Commerce's scope determination was flawed. First, Intrepid objects to the fact that no hearing was held by the ITA pursuant to the Administrative Procedure Act. Second, Intrepid contends that the antidumping duty order was vague, and thus the ITA should have based its scope determination on the analysis approved by the court in *Diversified Prods. Corp. v. United States,* 6 CIT 155, 572 F.Supp. 883 (1983). Finally, plaintiff claims that the scope determination was not supported by substantial evidence.

### Discussion

A determination by the Department of Commerce will be affirmed provided it is supported by substantial evidence and is otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States,* 12 CIT 343, 345, 685 F.Supp. 1252, 1255 (1988) (citations omitted).

### I. Administrative Procedure Act

As a threshold issue, plaintiff maintains that, in conducting its scope investigation, Commerce was required to comply with those provisions of the Administrative Procedure Act ("APA") which provide for hearings in administrative adjudications. 5 U.S.C. §§ 554 and 556 (1988). Section 774 of the Tariff Act of 1930, *as amended,* 19 U.S.C. § 1677c, provides for hearings in antidumping and countervailing duty proceedings and specifically excepts those proceedings from the purview of the APA.[1] Therefore, plaintiff's argument that the ITA's investigation did not comport with the APA requirements is a moot one; the investigation need not so comport.

---

1. Subsection (b) reads:

   **Procedures**.... The hearing shall not be subject to the provisions of subchapter II of

   chapter 5 of Title 5, or to section 702 of such title.

The Tariff Act provides that the ITA shall "hold a hearing in the course of an investigation upon the request of any party to the investigation before making a final determination." 19 U.S.C. § 1677c(a) (1988). There is no indication in the record that Intrepid requested a hearing; indeed, Intrepid does not contend that it did. Therefore, the Court finds that there was no error in the fact that no hearing was held.

## II. Scope of the Order

Customarily, when a question arises as to whether a particular pre-existing product is within the scope of an antidumping duty order, the ITA first must determine whether the petition and the ITA's determinations cover that product. If they are ambiguous or vague, Commerce then examines additional documentary evidence. If the scope is still unclear, Commerce may look to other criteria, including the factors enumerated in *Diversified Products*, 6 CIT at 162, 572 F.Supp. at 889.[2] *See American NTN Bearing Mfg. Corp. v. United States*, 14 CIT ——, ——, 739 F.Supp. 1555, 1565 (1990); *SKF USA, Inc. v. United States*, 15 CIT ——, ——, 762 F.Supp. 344, 348 (1991). Commerce *must* look to *Diversified Products* only when determining if a newly developed product is within the scope of the order. *Id.* There has been no argument from Intrepid that its BS pipe was not in existence at the time of the investigation. Intrepid asserts that the antidumping duty order on pipes and tubes was vague and, hence, the ITA was required to use the *Diversified Products* analysis to determine the scope of the Order.

The starting point for reviewing a scope determination is the petition. The petition described the merchandise to be investigated as

certain circular welded carbon steel circular pipes and tubes, .375 inch or more but not over 16 inches in outside diameter. The product includes "standard pipe," which is a general-purpose commodity used in such applications as plumbing pipe, sprinkler systems and fence posts and is commonly referred to in the industry as a standard pipe. It may be supplied with an oil coating (black pipe) or may be galvanized, and is sold in plain ends, threaded, threaded and coupled, or beveled for welding form. (These products are generally produced to [American Society for Testing and Materials ("ASTM")] specifications A–120, A–53, or A–135.) The product also includes "line pipe," which is produced to API specifications for line pipe, API–5L or API5X.

AR Doc. 3 at Ex. 1.

In the final determinations, Commerce adopted a similar description of the scope as "certain circular welded carbon steel pipes and tubes, also known as 'standard pipe' or 'structural tubing,' which includes pipe and tube with an outside diameter of 0.375 inch or more but not over 16 inches, or any wall thickness, as currently provided in" various enumerated tariff classifications. *Antidumping: Circular Welded Carbon Steel Pipes and Tubes From Thailand; Final Determination of Sales at Less Than Fair Value*, 51 Fed.Reg. 3,384 (1986).

Intrepid claims that these descriptions are vague and ambiguous because "[n]ot a word appears anywhere in the ITA's or ITC's descriptions suggesting that pipe manufactured to British Standard specifications is included." *Memorandum of Points and Authorities in Support of Motion For Remand Based Upon Agency Record* at 14. Furthermore, plaintiff contends that its pipe should not have been included because the scope descriptions refer to pipes and tubes manufactured to ASTM specifications, which BS pipe is not. Since Intrepid's BS pipe cannot be substituted for ASTM products, and the pipe can be used only in areas subject to British Commonwealth standards (among them, Puerto Rico), Intrepid avers that its pipe was wrongly embraced by the Order.

---

**2.** These include the general physical characteristics of the merchandise, the expectations of the ultimate purchasers, channels of trade in which the goods travel, the ultimate use of the product, and its cost. *Id.*

Intrepid's pipe fits the criteria set out in the petition's description in that it is circular welded carbon steel pipe between 0.375 and 16 inches in outside diameter. In addition, Intrepid itself asserted that it is used for general purposes, such as the conveyance of water. AR Docs. 1 and 4. The ITA need not have specifically identified BS pipe as one of the subject merchandise for it to be included in the scope of the Order.

Plaintiff acknowledges that its pipe and ASTM pipe share "similar physical characteristics." AR Doc. 4 at 4. However, Intrepid focuses on differences in wall thickness and hydrostatic pressure to distinguish its product. AR Doc. 1 at 2. Neither of these traits was among the characteristics used in describing the product either in the petition or in the final determination. In fact, the final determination specifically stated that pipes and tubes of "any wall thickness" were included in the scope. 51 Fed.Reg. at 3,384. Since Intrepid's pipe fits the outside diameter and use criteria listed in the petition and the final determination, it is evident that plaintiff's product is within their scope.

Nonetheless, Commerce considered additional documentary evidence submitted by petitioners and by respondent Saha Thai Steel Pipe Co., Ltd. ("Saha Thai") prior to making its scope determination. AR Docs. 3, 5 and 7. Petitioners' submissions included several exhibits, among them relevant portions of the final determination of the International Trade Commission ("ITC") and charts depicting the wall thickness and outside diameter of various ASTM and BS pipes.

The ITC's final determination explains that steel pipes and tubes are "produced according to standards and specifications published by a number of organizations" in the United States and abroad. AR Doc. 3 at Ex. 5. Specifically, the ITC referred to associations comparable to the ASTM in Japan, West Germany, the United Kingdom and the Soviet Union. Hence, the ITC envisioned that the scope of the investigation encompassed pipes made to myriad specifications. Furthermore, the ITC stated that standard pipe is intended for the low-pressure conveyance of, *inter alia,* water. AR Doc. 3 at Ex. 5. Intrepid similarly described its pipe as a "water pipe" or "conduit of water." AR Doc. 1 at 1; AR Doc. 4 at 4.

Lastly, counsel for Saha Thai offered that the ITA's final determination acknowledged the similarities between British Standard medium and heavy pipe and ASTM–120 pipe for purposes of determining the foreign market value of respondent's pipe. 51 Fed.Reg. at 3,386. That the ITA chose to use BS pipe to determine foreign market value indicates that the ITA felt that Intrepid's BS pipe and ASTM–120 pipe were "such or similar merchandise" as required for such a comparison by 19 U.S.C. § 1677b(a).[3]

Since there was sufficient and succinct information in the petition and in additional documentary evidence for the ITA to make a scope determination regarding Intrepid's BS pipe, it was not required that Commerce use the *Diversified Products* analysis to reach its decision.

### Conclusion

Upon review of the administrative record, the Court finds that it contains substantial evidence to support the ITA's determination that Intrepid's BS pipe is within the scope of the Order. The Court also finds that the determination is otherwise in accordance with law and accordingly, it is hereby affirmed.

---

**3.** Intrepid argues that the final determination found only that BS medium and heavy pipe were similar to ASTM–120 pipe, and thus BS light pipe, which plaintiff states is the subject of its scope exclusion request, was not considered similar. As stated above, wall thickness and hydrostatic pressure were not among the factors which determined the scope and, therefore, Intrepid's distinction is immaterial.